Emma C. McIlwaine et al., [1] v. Commissioner. Emma C. McIlwaine v. Commissioner
Docket Nos. 30715, 30716, 30717, 30735, 30736.
United States Tax Court
1952 Tax Ct. Memo LEXIS 77; 11 T.C.M. (CCH) 964; T.C.M. (RIA) 52288; September 29, 1952
*77 1. The Finnie Company of Memphis, Tennessee, formed by partnership agreements entered into on September 1, 1943, performed certain war contracts. Respondent determined that the wives of Trusty, Holt, and Carson were not valid members of the partnership. Held, the respondent erred in his determination, and the partnership income for the years 1943, 1944, and 1945 is taxable to the petitioners in accordance with the terms of the partnership agreement. 2. The partnership erected leasehold improvements costing $7,131.98 in 1943 and $1,957.50 in 1944 upon premises leased on a month-to-month basis. Held, these leasehold improvements must be capitalized with the cost recovered through depreciation during the useful life of the improvements. Held, further, the partnership abandoned on July 1, 1944 the leasehold improvements erected in 1943, and the partnership is entitled to deduct an abandonment loss. Held, further, petitioners failed to establish that the leasehold improvements made in 1944 were abandoned in 1945. Held, further, petitioners failed to establish that the partnership was entitled to accelerated depreciation; the composite rate of depreciation as determined by the Commissioner *78 was a reasonable allowance for depreciation. W. Stuart McCloy, Esq., 1224 Commerce Title Bldg., Memphis, Tenn., and Donald R. Wellford, Esq., for the petitioners. S. Earl Heilman, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion These proceedings which have been consolidated involve income tax deficiencies for the taxable years 1943, 1944, and 1945, for the following petitioners and in the following amounts: Deficiency
Name of Taxpayer
Docket No.
Year 1943
Year 1944
Year 1945
Emma C. McIlwaine
30715
$ 1,189.40
Katherine Waller Carson
30716
1,073.43
William W. Carson
30717
13,222.27
$7,361.72
$9,569.69
C. B. Trusty
30735
3,840.21
2,179.92
3,114.35
R. M. Holt
30736
10,690.83
6,052.04
8,236.03
*79 The petitioner R. M. Holt alleged that the respondent erred in disallowing a deduction of $332 claimed on his 1944 tax return as a loss from storm damage under section 23 (e) of the Code. This allegation of error is waived in petitioner's brief. This leaves for our consideration two types of issues. First, did the respondent err in taxing to petitioners R. M. Holt, C. B. Trusty, and William W. Carson the partnership income reported by their respective wives during 1943, 1944, and 1945 from The Finnie Company, or, in other words, were the wives of these petitioners valid partners in The Finnie Company during the taxable years? The second type issue relates to the amount of income earned by the partnership, The Finnie Company, during each of the taxable years. All the petitioners assign the same errors to certain of the respondent's adjustments which increased the ordinary net income of the partnership. The petitioner R. M. Holt made the following assignments of error in respect to partnership ordinary net income for the year 1943: "(b) * * * the Commissioner * * * erred in holding that the cost to The Finnie Company, a partnership, of certain equipment, leasehold and temporary *80 improvements were non-deductible capital expenditures, whereas, in reality, such expenditures in the amount of $7,131.98 were ordinary and necessary expenses incurred in business of The Finnie Company, for the year 1943, deductible in full under Section 23 (a) (1) of the Internal Revenue Code; or in the alternative, said leasehold improvements were depreciable over the terms of the lease under Section 23 (1) of the Internal Revenue Code. [As amended by petitioner.] "(c) * * * the Commissioner * * * erred in holding that $142.62 in depreciation deductions taken by The Finnie Company was excessive and unallowable, whereas, in reality, such depreciation deductions were a reasonable allowance for exhaustion, wear and tear on property used in the partnership business and deductible under Section 23 (1) of the Internal Revenue Code." The petitioner R. M. Holt made the following assignments of error in respect to the partnership ordinary net income for the year 1944: "(f) * * * the Commissioner * * * erred in holding that the cost to The Finnie Company, a partnership, of certain equipment, leasehold and temporary *81 improvements were non-deductible capital expenditures, whereas, in reality, such expenditures in the amount of $1,957.50 were ordinary and necessary expenses incurred in the business of The Finnie Company for the year 1944, deductible in full under Section 23 (a) (1) of the Internal Revenue Code; or in the alternative, said leasehold improvements were depreciable over the term of the lease under Section 23 (1) of the Internal Revenue Code. [As amended by petitioner.] "(g) * * * the Commissioner * * * erred in holding that $883.04 in depreciation deductions taken by The Finnie Company was excessive and unallowable, whereas, in reality, such depreciation deductions were a reasonable allowance for exhaustion, wear and tear on property used in the partnership business, and deductible under Section 23 (1) of the Internal Revenue Code." In respect to this same year 1944, the petitioner R. M. Holt contends also that the respondent erred in computing the gain or loss realized upon the sale of certain depreciable property used in the partnership business and Holt made the following assignment of error: "(h) * * * the *82 Commissioner * * * erroneously determined that The Finnie Company, a partnership, incurred a loss from sale of assets in the amount of $868.19, whereas, in fact, the partnership had a gain in the amount of $237.24." The petitioner R. M. Holt made the following assignment of error in respect to the partnership ordinary net income for the year 1945: "(j) * * * the Commissioner * * * erred in holding that $419.65 in depreciation deductions taken by The Finnie Company was excessive and unallowable, whereas, in reality, such depreciation deductions were a reasonable allowance for exhaustion, wear and tear on property used in the partnership business and deductible under Section 23 (1) of the Internal Revenue Code." Similar assignments of error relating to the partnership for the taxable years were made by the other petitioners herein, except that petitioners Emma C. McIlwaine and Katherine Waller Carson did not assign any errors for the taxable years 1944 and 1945, because they are not before us as petitioners in those years. As to them the Commissioner determined deficiencies only for the year 1943. Findings of Fact Petitioner C. B. Trusty and petitioner *83 R. M. Holt, and their respective wives, are residents of Memphis, Tennessee, and filed their separate individual tax returns for the calendar years 1943, 1944, and 1945 with their Collector of Internal Revenue at Nashville, Tennessee. Emma C. McIlwaine, Katherine Waller Carson, and William W. Carson, also petitioners herein, together with Eliza N. Carson, wife of William W. Carson, are residents of Knoxville, Tennessee, and filed their separate individual tax returns for the calendar years involved with the Collector of Internal Revenue at Nashville, Tennessee. Facts - Partnership Issue The capital contributions to form The Finnie Company, hereinafter referred to as the partnership, were made during 1943 and were as follows: Per Cent
Capital
of Total
Name
Contribution
Capital
R. M. Holt
$ 5,800.00
11.6
Mrs. R. M. Holt
5,800.00
11.6
C. B. Trusty
3,257.40
6.5148
Mrs. C. B. Trusty
2,500.00
5.0
Katherine Waller Carson
11,321.30
22.6426
Emma C. McIlwaine
11,321.30
22.6426
Eliza N. Carson
10,000.00
20.0
$50,000.00
100.00
During the taxable years the partnership net income was allocated between the partners on *84 the basis of capital contributions, and so reported on their individual income tax returns, except for the provision in the partnership agreement that "R. M. Holt and C. B. Trusty, shall receive an additional consideration for their services in connection with the Partnership management, $750 and $375 per month, respectively, which amounts shall be deducted from the net operating profits of the Partnership before determining the amounts to be paid each respective partner upon the termination of the period for accounting of profits." The respondent determined that partnership income, after providing for compensation to be paid managing partners, was allocable during the taxable years as follows: Percentage
Name
of Profit
R. M. Holt
23.2
Mrs. R. M. Holt
C. B. Trusty
11.5148
Mrs. C. B. Trusty
Katherine Waller Carson
22.6426
Emma C. McIlwaine
22.6426
Eliza N. Carson
William W. Carson
20.0
Total
100.0
Although Emma C. McIlwaine was a married woman her status as a partner was not challenged and neither was the status of Katherine Waller Carson, sister of William W. Carson, challenged as a partner. Respondent determined that the partnership *85 income reported by Eliza N. Carson was taxable to her husband, William W. Carson, even though he did not enter into the partnership agreement, did not render services to the partnership, and did not purport to be a partner and was never recognized as a partner by anyone connected with the partnership or anyone who dealt with it. Holt and Trusty, as managing partners of The Finnie Company, received the following compensation in addition to their distributive share of partnership profits based upon their contributions of capital: Name
1943
1944
1945
R. M. Holt
$3,000
$9,000
$23,200
C. B. Trusty
1,500
4,500
15,300 They have reported these amounts for taxation on their individual returns. Oliver-Finnie Company was started in 1860 as a proprietorship. It was incorporated in 1888 at which time its principal business was the selling of food products with wholesale and retail outlets with distribution handled by the company. In 1906, the operation was expanded to embrace the manufacture of candy, coffee roasting, and the preparation of teas, spices, extracts, and allied products. The plant is located at 23 Vance Avenue, Memphis, Tennessee, in a well-constructed *86 brick and tile-type building, consisting of seven floors and 189,000 square feet. During the years 1942, 1943, 1944, and 1945 Oliver-Finnie Company was engaged principally in the manufacture of candy, processing of candy and coffee items and related activities, but it also maintained warehouse facilities at its plant building and leased a part of its building to the partnership, The Finnie Company. R. M. Holt, president of Oliver-Finnie Company, has been with the corporation since 1927. C. B. Trusty, vice president and secretary-treasurer, has been with the company more than 20 years. William W. Carson who lives in Knoxville, Tennessee, and is a vice president of Oliver-Finnie Company, is also a technical consultant and works in Knoxville. The Chemical Warfare Service contacted Oliver-Finnie Company through Continental Can Company to see if the corporation would be interested in, or if in any way it could be of help with, the Chemical Warfare Program. The premises were inspected and Holt was requested to attend conferences in Atlanta. The type of project was explained to Holt and with such specifications and facts as were made available he returned to Memphis and discussed it with *87 the corporate directors. Meetings of the board of directors of Oliver-Finnie Company were held on August 18 and 19, 1943, to consider the Chemical Warfare Service Contract. William W. Carson, a director and officer of the corporation, was not present as he was suffering from a broken hip sustained June 22, 1943. The August 18, 1943 meeting of the board of directors was also attended by J. G. Griesbeck, as a representative of the corporation's auditors, and Fred Brown, as a representative of the corporation's tax attorneys. The minutes of the meeting state: "The meeting was called to consider a contract with the Chemical Warfare Service of the U.S.A.
"After considerable discussion the meeting adjourned until August 19, 1943, at 11 A.M. to allow Messrs. Holt, Brown and Griesbeck the necessary time to prepare a workable plan to carry out the successful completion of the contract." At the meeting of the directors on August 19, 1943, the decision of the board of directors was embraced in the following minutes: "It was moved, seconded and unanimously resolved that the corporation not enter into a certain proposed contract with Chemical Warfare Service, relating to the procuring *88 of protective equipment or other prime Government contracts unless directly pertaining to the candy and/or coffee business. It being the sense of the board of directors that the possible net gain to the corporation from such contracts was too little to justify the risk." The board of directors after considering the matters involved refused to authorize the project and the Chemical Warfare Service was notified. The rejection was based upon the uncertain nature, unfamiliar character and financial risk involved in the project so far as it might affect the regular business of the corporation. The Chemical Warfare Service needed help from experienced people and Holt, being concerned with the matter, hoped the service could be made available to the Government. Since a financially stable organization was necessary for a successful completion of any Government contracts, Holt held conferences with officials of the Union Planters National Bank & Trust Company and others regarding financial arrangements and considered corporation, limited and general partnerships as types of business organizations to handle the project. While these conferences were in process and before any loan was approved *89 or contract entered into, letters were written on August 23 and 24, 1943 to the stockholders of Oliver-Finnie Company, outlining a plan for the formation of a partnership to perform the contract. These letters read as follows: "A few days ago Oliver-Finnie Company was offered a Government Contract, the nature of which (because of secrecy agreements) can not be disclosed. "Subsequent to this offer, by Resolution of the Board of Directors, it was determined Oliver-Finnie Company should not accept the Contract responsibilities because - among other things - the net return to the Company did not justify the risk involved. "It is now proposed that a Limited Partnership be formed for the specific purpose of entering into the Contract, which is estimated will consume approximately five months for completion - on which an estimated gross profit of $50,000 to $60,000 should accrue. The Partnership will require an original capital contribution from its members of $50,000 which, of course, will be returnable to the partners upon the dissolution of the Partnership: provided, no losses are incurred. "A communication is being addressed to each of the stockholders of Oliver-Finnie Company, *90 giving them the opportunity of becoming one of the Limited Partners under the proposal. Your percentage of stock ownership to the total outstanding common stock is , which would cause your capital contribution to the Partnership to be $ . A space is provided below for your acceptance or rejection of the offer. If accepted, your check payable to The Finnie Company should accompany your acceptance. "Inasmuch as the proposed contract must be accepted within the immediate future… we will appreciate your response on or before five days from the date of this communication. "Cordially yours, /S/ R. M. Holt" These letters were mailed at a time when the negotiations for a contract with the Chemical Warfare Service were at an early stage. Many of the stockholders rejected the proposed limited partnership and those who were interested wanted to come in on such a small basis that it was not satisfactory and was not put into effect. Holt then proposed a general partnership, of which he and Trusty were to be the managing partners, and discussed it with various individuals, and in particular with his wife, C. B. Trusty and his wife, Eliza N. Carson, William W. Carson, Emma C. McIlwaine, and *91 Katherine Waller Carson. Holt and his wife, Trusty, Emma C. McIlwaine, and Katherine Waller Carson, all of whom were stockholders, accepted the general partnership plan. William W. Carson, a stockholder who was disabled at the time from a broken hip, declined to enter the partnership but his wife Eliza N. Carson was interested. The wife of Trusty was reluctant to enter the partnership fearing the possible loss of their home which formed the principal asset they possessed. As a result of these discussions in September 1943, R. M. Holt, Mrs. R. M. Holt, C. B. Trusty, Mrs. C. B. Trusty, Emma C. McIlwaine, Katherine Waller Carson, and Eliza N. Carson executed a partnership agreement, agreeing to engage in business as general partners under the name of The Finnie Company. The partnership agreement called for the contribution of capital in the amount of $50,000, and provided that the partners would share in the profits in proportion to their respective contributions. Eliza N. Carson made her capital contribution of $10,000 by drawing a check in favor of The Finnie Company, the partnership, dated August 27, 1943. The funds used for that purpose came from the following sources: she had *92 approximately $5,300 of her own money, including currency and money on deposit in checking and savings accounts, her husband gave her $2,500, and she borrowed $3,181.96 from him. The loan was evidenced by two noninterest bearing notes dated August 26, 1943, for $681.96 and $2,500, respectively. She repaid the notes on March 10, 1944, July 7, 1945, and April 8, 1946. On August 26, 1944, she loaned her husband $9,000 on a noninterest bearing note. William Carson repaid his wife $6,000 on September 25, 1944, and the balance was repaid on January 22, 1945. Upon several other occasions in 1943, 1944, and 1945 she loaned her husband sums of money. Mrs. R. M. Holt contributed capital of $5,600 to The Finnie Company by check dated September 2, 1943 and $200 by check dated September 15, 1943. The funds used by her for that purpose represented loans to her by her husband evidenced by an interest bearing promissory note. The note was duly paid by her to her husband on August 24, 1945. On September 2, 1943, Mrs. C. B. Trusty drew a check payable to The Finnie Company for $2,500, which sum was her capital contribution to the partnership. This check was drawn on a joint bank account maintained *93 by her and her husband. Of this amount, $1,250 belonged to her from gifts and savings and $1,250 was loaned to her by her husband. She gave him a note dated September 1, 1943, for $1,250 with provision for interest of three per cent. The note was paid by her to her husband on August 28, 1945; the source of the funds was distributions of earnings from the partnership. On September 3, 1943, the Chemical Warfare Service was notified that the partnership had been completed and on September 7, 1943, the Union Planters National Bank & Trust Company also confirmed completion of the partnership. The partnership was advised to proceed, and letters of intent were issued and the partnership proceeded to prepare for production. The need for production under the letters of intent or contract was so urgent that the matter was given a "green light" and speed of production urged to the point that at one time The Finnie Company had over 400 employees and operated three shifts. The nature of the component being handled was unknown but was demonstrated to be highly hazardous. The partnership performed two Chemical Warfare Service Contracts called No. 322 and No. 374, which contracts were completed *94 in February 1944. Contract No. 322 called for a total of 98,000 units over a three-month period, the value of the goods furnished being $4,000,000. Contract No. 374 provided for a total of 155,000 units. After the completion of these contracts, negotiations were conducted for a contract for the packaging of about 9,000,000 cans of 8-ounce vacuum-packed salted peanuts. The contract for packing salted peanuts was secured around July 1, 1944 and was terminated around June 12, 1945. The Union Planters National Bank & Trust Company of Memphis handled the financial arrangements for the Government contracts entered into by the partnership. The bank required William W. Carson, who did not sign the partnership agreement, to guarantee the loan arrangements made by the partnership. The officer of the bank who handled the loans testified that under the circumstances the guarantee of Carson was required for the protection of the bank. The circumstances were that the partnership was a newly organized business with a limited investment about to enter into large war contracts of a speculative nature. It was not unusual for the bank to require a guaranty in addition to a note in the case of partnerships. *95 The bank did not consider Carson as a partner and never dealt with him as such. The bank dealt with R. M. Holt and his wife, C. B. Trusty and his wife, Katherine Waller Carson, Emma C. McIlwaine, and Eliza N. Carson as the partners having membership in The Finnie Company. William W. Carson never signed or executed any agreement to be a partner in The Finnie Company, nor did he indirectly enter into any agreement with the partnership; he contributed no capital to the partnership; while his wife Eliza N. Carson and his two sisters, Emma C. McIlwaine and Katherine Waller Carson, were partners he had no dealings with the partnership as a partner. When the bank insisted that he endorse the note or sign as a guarantor for the partnership, Carson did so voluntarily. In signing the guaranty Carson became secondarily liable and his liability was limited to the amount of the notes due to the bank. The combined net worth of those who executed the partnership agreement who were primarily liable exceeded $350,000. Carson and his wife Eliza N. Carson kept separate bank accounts and they always kept their finances separate. During the taxable years The Finnie Company made distributions to the partners *96 by checks delivered to them, including the wives of Carson, Holt, and Trusty, in proportion to their capital investments therein. The funds received by the wives of Carson, Holt, and Trusty were used by them free of any direct or indirect control or appropriation on the part of their husbands. Except for Holt and Trusty none of the partners rendered vital services of any importance or consequence to this partnership. The Finnie Company, a partnership, was formed on September 1, 1943, for the purpose of handling a Government contract with the United States Chemical Warfare Service after the Oliver-Finnie Company, a corporation, refused to accept the contract because of the risk involved. Capital was a material factor in the organization of the partnership and the production of its income. Without capital of its own the partnership could not have operated. The Finnie Company was a partnership formed for a business purpose. R. M. Holt, Mrs. R. M. Holt, C. B. Trusty, Mrs. C. B. Trusty, Emma C. McIlwaine, Katherine Waller Carson, and Eliza N. Carson, each fully intended in good faith to become partners therein and conduct a partnership. Eliza N. Carson, Mrs. R. M. Holt, and Mrs. C. *97 B. Trusty, like the other partners, made bona fide contributions of capital to The Finnie Company. The partners of The Finnie Company were those persons who executed the partnership agreement, and their interests in the partnership's distributive share of partnership income during the taxable years were as stated in the partnership agreement. Amount of Partnership Income The Finnie Company conducted its operations under the Chemical Warfare Service Contracts in the seven-story Oliver-Finnie Company building at 23 Vance Avenue, Memphis, Tennessee. The Finnie Company, under a lease effective September 1, 1943, leased 37,000 square feet of space and the space occupied by the partnership was in what is known as a subbasement, part of the main floor and part of the second floor of the Oliver-Finnie Company building. The lease, providing for rents of $709.17 per month, was on a month-to-month basis and terminable upon 90 days written notice being given by either party, or by mutual agreement. The amount of rent paid by the partnership under this agreement is not apparent from the record, but on the tax returns the partnership claimed deductions for rent of $4,937.09 in 1943, $3,906.12 *98 in 1944, and $1,826.90 in 1945. Thereafter, and before commencement of operations on November 11, 1943, the partnership arranged for the installation of toilet facilities, office facilities, and other initial improvements in order to adopt the leased premises to meet the requirements of the contract and those of the Tennessee Department of Labor. For this purpose the partnership expended during 1943 the sum of $7,131.98, which was deducted by the partnership as ordinary and necessary business expenses and which has been capitalized by the respondent as depreciable assets. The sum of $7,131.98 was expended as follows: How Expended
Amount
(a) Installation of heavy equipment used in the actual performance of
the Chemical Warfare Contract
$ 970.25
(b) Extensive remodeling and alterations of office space, including parti-
tion walls, mill work, asphalt tile floor and wiring
3,894.29
(c) Architect's fee on office alternations
292.07
(d) Wiring and installation of new light fixtures
255.00
(e) Alternations and heating equipment for portion of the factory
200.77
(f) Installing a new lavatory
1,394.25
(g) Installation costs of time clock
125.35
Total
$7,131.98
*99 After the completion of the Chemical Warfare Contract in February 1944, the partnership no longer used these assets in its trade or business and they were abandoned. During the year 1943, The Finnie Company expended the sum of $9,527.57 on machinery and equipment used in the Chemical Warfare Contract. These expenditures were capitalized and depreciated on the basis of a five-year life on the 1943 and 1944 partnership income tax returns. The Commissioner determined that these assets had a useful life of 10 years and depreciated them on that basis. The Finnie Company operated three shifts, 24 hours a day, seven days a week from some time in October or November 1943 until completion of the Chemical Warfare Service Contracts in February 1944, and used some of its machinery and equipment 24 hours a day during that period. On or about July 1, 1944, The Finnie Company commenced operations on a second war contract. It was with the United States Army and called for the processing and canning of salted peanuts for overseas shipment to the armed forces. The portions of the premises originally leased from the Oliver-Finnie Company during the Chemical Warfare Contract operations were unsuitable *100 for the performance of the peanut contract and a different portion of the building, the fifth floor, was leased under a supplemental lease effective July 1, 1944. This lease, which was a month-to-month lease terminable upon 30 days written notice, provided for space and rental payments as follows: "For the months of July to November, 1944, inclusive, the LESSEE agrees to and has leased from the LESSOR under the conditions hereinafter set out, 8,169 square feet of floor space per month, at 24" per square foot, and subsequent thereto until reduced or entirely revoked as hereinafter provided, 12,649 square feet of floor space at 24" per square foot. * * *" In the performance of the peanut contract it became necessary for the Finnie Company to install a tile floor on the leased premises at a cost of $1,957.60. For tax purposes this expenditure was charged off as an ordinary and necessary expense during the year 1944 by The Finnie Company. The respondent in the notices of deficiency determined that the expenditure was to be capitalized and allowed depreciation thereon at an annual rate of five per cent. During the year 1944, in the performance of the peanut contract the Finnie Company *101 expended $4,424.38 on machinery and equipment which was capitalized on the partnership books and depreciated at a composite rate of 20 per cent on an estimated life of five years without provision for scrap value. The respondent in his deficiency notices determined a useful life of 10 years and allowed depreciation on a composite rate of 10 per cent with no provision for scrap value. Some of the equipment purchased in 1944 was used 18 hours per day during part of 1944 and part of 1945. During the year 1945, the Finnie Company expended the sum of $3,140.77 on machinery and equipment used in the performance of its peanut contract, the largest item of which was a $2,900 expenditure for a special machine for canning peanuts. The partnership claimed on its tax return, and petitioners now claim, depreciation thereon at a composite rate of 20 per cent. In the deficiency notices respondent determined that the proper rate of depreciation to be allowed is 10 per cent. The $2,900 machine is still owned by the partnership, but is not in use. Such machines are not generally used in the trade; it is now obsolete and the partnership has been unable to sell it. By letter dated June 12, 1945, the *102 Finnie Company gave notice to Oliver-Finnie Company that it desired to cancel the supplemental lease of July 1, 1944 and the lease agreement of September 1, 1943. These leases were terminated, therefore, on or about August 1, 1945. Dismantled machinery and equipment purchased at a cost of $6,556.37 for use in the Chemical Warfare Service Contract was sold in 1944 through the Chemical Warfare Service because the partnership had no further use for it and it was critically needed in other plants performing similar contracts. On the 1945 partnership return, Form 1065, The Finnie Company reported gain from sale of capital assets, as follows: Sale of Capital Assets
Acquired
Sold
Sales Price
Cost
Depr.
Gain
Conveyor System
12/31/43
7/1/44
$3,975.00
$4,077.00
$543.60
$441.60
Compressors (2)
12/10/43
7/1/44
617.00
674.00
89.87
32.87
Hopper, Shaker, etc.
1,564.66
1,805.37
240.71
Total
$6,156.66
$6,556.37
$874.18
$474.47
Total Net Long Term Gain (50%)
$237.24
As a result of the adjustments in the rate of depreciation hereinabove referred to the Commissioner in his notices of deficiency determined that an *103 ordinary loss in the amount of $868.19 was realized on the sale of these assets. Ultimate Facts - Partnership Income The expenditure of $7,131.98 in 1943 by The Finnie Company for equipment, installation costs, and remodeling of property leased on a month-to-month basis from Oliver-Finnie Company represented a capital expenditure. The capital expenditure is to be depreciated over the estimated life of the improvements as determined by the respondent up to July 1, 1944, at which time these assets were abandoned. The partnership is entitled to an abandonment loss, section 23 (e) of the Code, to the extent of the adjusted basis of these improvements on July 1, 1944. The expenditure of $1,957.50 spent in 1944 by The Finnie Company for the cost of materials and installation of a tile floor on property leased on a month-to-month basis from Oliver-Finnie Company constituted a capital expenditure. The cost of this asset is to be recovered by depreciation over the estimated life of the improvements as determined by the respondent. The Finnie Company is entitled to depreciation on machinery and equipment purchased in 1943, 1944, and 1945 and used in its business on the basis of an estimated *104 composite life of 10 years. The Finnie Company suffered an ordinary loss of $868.19 upon the sale of certain assets in 1944. Opinion BLACK, Judge: The principal issue in this proceeding involves the validity of the general partnership, The Finnie Company, formed by a written agreement entered into by the parties on September 1, 1943. In our Findings of Fact we have given the circumstances surrounding the creation of the partnership, the nature of the partnership business during the taxable years, and the relationship of the parties recognized by the respondent as partners and also the relationship of others not so recognized. Respondent has recognized as partners Emma C. McIlwaine, Katherine Waller Carson, C. B. Trusty, and R. M. Holt, each of whom entered into the partnership agreement, and as the fifth partner respondent recognized William W. Carson, who did not enter into the written agreement or otherwise purport to be a partner and clearly was never a partner. Respondent determined as taxable to Carson that distributable share of partnership income reported by Carson's wife. In addition, respondent determined as taxable to C. B. Trusty and R. M. Holt that portion of partnership *105 income reported by their respective wives. In view of the facts which have been proved by uncontradicted evidence and which we have embodied in our Findings of Fact, we hold the respondent's determinations are in error. In determining whether a partnership is real within the meaning of the Federal revenue laws the test is not merely an objective one, considering whether "vital services are rendered" and whether a "capital contribution" is made. The test is a subjective one requiring a determination of whether the parties did or did not intend in good faith to join together as partners in the present conduct of the business, Commissioner v. Culbertson, 337 U.S. 733. Of course, in determining whether this subjective test is satisfied we must consider all the objective facts established by the evidence. This we have done, and under the foregoing facts we determined that the wives of Carson, Trusty, and Holt were valid partners in The Finnie Company during the taxable years and the partnership income is to be allocated and taxed to the partners in accordance with the provisions *106 of the partnership agreement. Amount of Partnership Income The remaining issues to be decided in this proceeding relate to the amount of income earned by the partnership during each of the three taxable years, 1943, 1944, and 1945. We consider first the issue, stating it broadly, what is the proper method to be used by the partnership to recover the cost of certain leasehold improvements. The expenditures for leasehold improvements of $7,131.98 in 1943 and $1,957.50 in 1944 are of the type, had the partnership been the owner of the property, that ordinarily would be classed as capital expenditures for which no deduction as an ordinary and necessary business expense is allowed in the year of the expenditure under section 23 (a) of the Code, section 24 (a) (2) of the Code so provides. If the result is to be different here, then it must be because of the terms of the lease. The partnership, according to the terms of the lease, rented the property upon which the improvements were made on a month-to-month basis. It is a well settled principle of law that where a lessee makes improvements *107 on property leased for an indefinite period on a month-to-month basis, or under a tenancy at will, the expenditure is capitalized rather than deducted as a business expense in the year of expenditure, and depreciation is based on the estimated life of the improvement as if the lessee were the owner of the improved property, Geo. H. Bowman Co., 7 B.T.A. 399, affd. 32 Fed. (2d) 404. In that case we said: "* * * The duration of petitioner's tenancy of the building was indefinite and indeterminable. It occupied the premises at the will of the lessor and until it appears that petitioner's tenancy will end at some definite time, it is entitled to a deduction in the taxable year of no more than a reasonable allowance for the exhaustion of the cost of improvements over the useful life thereof. If petitioner's tenure extends over the period of the useful life of the improvements it will have recovered its cost through the annual allowance for exhaustion; if the tenure should for any reason terminate prior to the useful life of the improvements petitioner will then be entitled *108 to a deduction from gross income of the unextinguished cost of such improvements. In either event petitioner will have obtained the deduction to which, under the statute, it is entitled." [Cases cited.] Applying these principles to the $7,131.98 leasehold improvements in question, the partnership must capitalize the expenditure and then the partnership is entitled to deduct depreciation for the four months use of the improvements in 1943 and during 1944 for the six months the improvements were used in the partnership business (as we shall see the partnership is not entitled to depreciation after July 1, 1944). Petitioners contend alternatively that if the leasehold improvements must be capitalized, then their useful life is 10 months and the cost is therefore to be recovered during that period with an equal amount of depreciation to be allowed during each of the 10 months. Respondent has determined, and he contends, that the cost must be recovered on the basis of a useful life of 10 years. In view of the facts which are in the record we cannot agree with respondent's determination nor with the alternative contention of the petitioners. The events which took place, the facts relating *109 to the $7,131.98 leasehold improvements, are inconsistent with the methods used by the parties in computing the partnership's recovery of cost. Respondent failed to apply section 23 (e) of the Code and the corresponding provisions of Regulations 111 (section 29.23 (e)-3) which would have allowed the partnership an abandonment loss; see also Cumulative Bulletin, 1945, pp. 91-95, and particularly subdivision (e). While the petitioners failed to plead specifically this subsection and to seek a deduction for an abandonment loss even though they established facts which warrant the application of this provision of the Code, nevertheless, we shall apply it. The issue here is, as we see it, how is the partnership to recover the cost of the leasehold improvements made in 1943. The proper result here is first to allow for the taxable year 1943 a deduction for depreciation computed upon a useful life of 10 years, and then for the year 1944 to allow depreciation for the first six months at the same rate, then the partnership is in 1944 entitled to a deduction for an abandonment loss to the extent of the unrecovered cost of the leasehold improvements as of July 1, 1944. The facts established *110 in the record satisfy all the prerequisites of an abandonment by the partnership of the leasehold improvements. On July 1, 1944, there occurred an identifiable event which when coupled with the surrounding circumstances indicates to us that the partnership intended to abandon permanently the depreciable assets acquired in 1943. We determine, therefore, that the partnership is entitled to a deduction under section 23 (e) of the Code for the abandonment loss incurred by it in 1944. Next, we consider the partnership expenditure of $1,957.50 for a tile floor erected in 1944 on premises leased on a month-to-month basis. Like the leasehold improvements made by the partnership in 1943, this expenditure is a leasehold improvement to be capitalized, with the cost to be recovered over a period of years by means of a depreciation deduction. The partnership is entitled to a deduction for depreciation during 1944 and 1945, beginning with the date of acquisition, July 1, 1944, for the cost of the tile floor at the rate determined by the respondent. While we determined that the leasehold improvements erected in 1943 were abandoned on July 1, 1944 upon surrender of the leased premises, the evidence *111 does not warrant a determination that the tile floor was permanently abandoned by the partnership on August 1, 1945. The tile floor was erected in connection with the partnership's second war contract, a contract calling for the canning of peanuts. The second contract was a different business from the first contract, the first contract requiring the partnership to can secret, dangerous chemicals of war. We are satisfied that the partnership abandoned the type business called for in the first contract. However, the only evidence in support of the finding of an abandonment of the 1944 improvements is the written notice given by the partnership of the termination of the written lease agreement and the supplement effective August 1, 1945. Admittedly, this lease was cancelled. but as indicated by its tax return, the partnership as of December 31, 1945, had inventories valued at $136,223.03 and leased premises were needed to store these inventories. The existence of these inventories, space being needed for storing them, and the fact that the partnership was still in business at the end of 1945, are inconsistent with a finding that the partnership abandoned the leasehold improvement of 1944. *112 The facts established by petitioners in respect to the tile floor are incomplete, therefore, we cannot determine that it was abandoned by the partnership during the taxable year 1945. The final issue presented for our determination is whether the partnership is entitled to an accelerated rate of depreciation of 20 per cent per annum during the taxable year as claimed by petitioners, or whether the partnership is entitled to a 10 per cent depreciation rate as allowed by respondent in the notices of deficiency. Both respondent and the petitioners use a composite rate of depreciation covering all the depreciable properties of the partnership. This rate is applicable to the leasehold improvements in addition to the machinery and equipment which were purchased during the taxable years and capitalized by the partnership. The partnership acquired machinery and equipment during each of the taxable years. During 1943, the partnership spent $9,527.57 on the following items: a time clock, 34 "Daybrite Florescent Fixtures," scales, pistols for guards, hydraulic jolter, Wylie automobile, conveyor system costing $3,975, compressor costing $617, hopper, shaker, and other miscellaneous equipment. *113 In 1944, the partnership acquired and capitalized depreciable machinery and equipment costing $4,424.38 and consisting of trucks of some kind, boilers, scales, and stitching machines. In 1945, it acquired depreciable machinery and equipment costing $3,140.75, the chief item being a "Triangle Machine" for canning peanuts and costing $2,900. There was testimony to the effect that the equipment purchased during 1943 was used 24 hours a day, seven days a week, from date of acquisition until completion of the Chemical Warfare Service Contract in February 1944, that the normal life of the equipment was considered to be 10 years, and that the partnership claimed depreciation on the basis of a five-year life because of the accelerated use. Also, there was testimony that the equipment purchased in 1944 and 1945 was used at times 18 hours per day. From the record, all we can conclude is that certain of the equipment was used during part of the taxable years appreciably more than normal usage. We are here called upon to determine what is a reasonable and composite rate of depreciation for all the depreciable property of the partnership for the three taxable years before us. We note that in *114 Bulletin F for industries most nearly like that of the partnership which during the taxable years were engaged in two different types of business, the composite lives given for machinery and equipment are as follows: Canned products
15 to 17 years
Chemicals
15 to 20 years
Coffee, Tea and Spices
17 years
Confections
15 years
It appears to us that respondent in his determination of a useful life of 10 years has already given effect to the special conditions under which the partnership operated. There has been no showing here that the usage in the years 1943, 1944, and 1945 actually shortened the useful life of the partnership machinery and equipment. Cf. H. E. Harman Coal Corporation, 16 T.C. 787. Respondent did not err in determining that a reasonable allowance for depreciation for the partnership depreciable property computed under a composite rate is 10 per cent for each of the taxable years 1943, 1944, and 1945. No issue is presented for our decision by the petitioners' allegation that "the Commissioner * * * erroneously determined that The Finnie Company, a partnership, incurred a loss from sale of assets in the amount of $868.19, whereas, *115 in fact, the partnership had a gain in the amount of $237.24." Whether the partnership realized a gain or loss upon the sale depends upon the adjusted basis of the depreciable property sold, and the adjusted basis depends upon the rate of depreciation. Our determination that a 10 per cent rate of depreciation was a reasonable one disposes of this allegation of error. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Katherine Waller Carson, William W. Carson, C. B. Trusty, and R. M. Holt.↩