SANDOVAL ZINC COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59819. Filed February 28, 1958.

*Charles L. Brown*, an officer, for the petitioner.
*Charles B. Wolfe, Jr., Esq.*, for the respondent.

#### OPINION.

ARUNDELL, *Judge:* Respondent determined a deficiency in income (excess profits) tax for the taxable year 1951 in the amount of $5,909.14.

The only question is whether the proceeds received by petitioner from the sale to two of its employees of certain shares of its own stock which petitioner had previously purchased from one of its stockholders at the same price for which it resold it, and had not retired but was, prior to the resale, holding in its treasury, constituted "money * * * paid in for stock" as that phrase is used in section 435 (g) (3) (A), I. R. C. 1939. The year 1952 is also involved due to an unused excess profits credit carryback.

The facts were stipulated and are summarized below.

Petitioner was incorporated in 1901 under the laws of the State of Illinois. Its principal office for the calendar years 1951 and 1952 was

in Chicago. Petitioner reported its income on a calendar year basis using an accrual method of accounting and filed its corporation income tax returns with the district director of internal revenue at Chicago.

On or about July 2, 1948, petitioner acquired for cash 900 shares of its then authorized, issued, and outstanding common stock for the sum of $84,447, which was at a price of $93.83 per share. The purpose of this acquisition, as stated in the minutes of a stockholders' meeting held on July 2, 1948, was to enter into contracts with two of petitioner's employees to resell the purchased stock to them equally at the same price for which it was purchased from the stockholder Leonard Weill. The shares so purchased from Weill were not retired by petitioner but were held as authorized and issued common shares in its treasury, to be sold pursuant to an employment agreement dated July 2, 1948, between petitioner, as party of the first part, and Albert Haas and Nathaniel Newburgh, parties of the second part. This agreement provided in part as follows:

First, The party of the first part agrees to employ the parties of the second part and to pay to each of them as compensation for their services during the period commencing July 2nd and ending December 31st 1948, * * * ($50.00) per week and a bonus of * * * (22½%) of the net income of the party of the first part before deduction of a bonus of twenty-five per cent of the profits payable to Leonard Weill in lieu of any other compensation for his services, and before the calculation and deduction of Federal Income, Surtax and Excess Profits Taxes. It being understood that at the end of the said period ending December 31st 1948, this agreement is to be extended for annual calendar periods commencing January 1st 1949, and each year thereafter, but it shall not be extended beyond the space of twenty years from July 2, 1948.

Second, The part [sic] of the first part agrees to sell to the parties of the second part all or any portion of the * * * (900) shares of the capital stock of the party of the first part * * * now held in the Treasury of the said party of the first part at * * * ($93.83) per share. It being understood that such sales shall always be of an equal number of shares to each of the parties of the second part. * * * the purpose of this provision being that each of them shall maintain an equal number of shares. It being also understood and agreed that neither Albert Haas nor Nathaniel Newburgh shall dispose of or sell any of their shares so acquired without first giving the party of the first part, in each instance, one year's notice of such intention to dispose of or sell with the right of the party of the first part to reacquire such shares at * * * ($93.83) per share payable from the treasury of the said party of the first part * * *. It is further agreed that of the bonus of * * * (22½) of the profits at least * * * (⅓) of such amount as received must be used for the purchase of shares.

For the calendar years 1948 to 1952, inclusive, petitioner reported the unsold portion of the treasury shares as an asset under the caption "Other Investments" or under the caption "Other Assets" in the balance sheets, which formed a part of the corporation income tax returns filed by it. A summary of the treasury stock transactions for the calendar years 1948 to 1952 is as follows:

| | | Debit | Credits | Balance |
|---|---|---|---|---|
| July 2, 1948 | --------------------- | $84, 447 | ---------- | ---------- |
| Dec. 31, 1948 | --------------------- | -------- | ---------- | $84, 447. 00 |
| Jan. 13, 1949 | 104 shares sold---------- | -------- | $9, 758. 32 | ---------- |
| Dec. 31, 1949 | --------------------- | -------- | ---------- | 74, 688. 68 |
| Jan. 25, 1950 | 38 shares sold----------- | -------- | 3, 565. 54 | ---------- |
| Dec. 31, 1950 | --------------------- | -------- | ---------- | 71, 123. 14 |
| Jan. 9, 1951 | 282 shares sold---------- | -------- | 26, 460. 06 | ---------- |
| Dec. 31, 1951 | --------------------- | -------- | ---------- | 44, 663. 08 |
| Jan. 15, 1952 | 476 shares sold---------- | -------- | 44, 663. 08 | ---------- |
| Dec. 31, 1952 | --------------------- | -------- | ---------- | 0 |

For the calendar years ended December 31, 1951, and December 31, 1952, petitioner's excess profits credit was determined under section 435, I. R. C. 1939, and its average base period net income was determined under section 435 (d) of the said Internal Revenue Code.

Paragraph 7 of the stipulation of facts is as follows:

7. In determining the petitioner's net capital addition for the calendar years 1951 and 1952 under subsection 435 (g) (1) of the Internal Revenue Code of 1939, as amended, the Commissioner determined that the sale of petitioner's 282 treasury shares of common stock in 1951 and the sale of petitioner's 476 treasury shares of common stock in 1952 did not constitute a capital addition for any day of the respective taxable years inasmuch as it was determined the cash received for such shares was not an amount of money paid in for stock within the meaning of subsection 435 (g) (3) (A) of the Internal Revenue Code of 1939. However, in addition to the amount of net capital addition otherwise determined by the Commissioner for the calendar years 1951 and 1952 under the provisions of the first two sentences of subsection 435 (g) (1) of the Internal Revenue Code of 1939, as amended, the provisions of subsections 435 (g) (9) and 435 (g) (10) of the Internal Revenue Code of 1939 were also considered by the Commissioner. To the extent the cash proceeds from the sale of the 282 shares of treasury stock in 1951 and from the sale of the 476 shares of treasury stock in 1952 were converted to operating assets in accordance with the rules prescribed in subsections 435 (g) (9) and 435 (g) (10) of the Internal Revenue Code of 1939, the Commissioner increased the petitioner's net capital addition for the taxable year otherwise computed under such section.

As of July 2, 1948, the petitioner was authorized to issue 1,500 shares of common stock with a par value of $100 per share. Prior to the acquisition of the 900 shares of common stock pursuant to the employment agreement referred to herein, all 1,500 shares of common stock were issued and outstanding.

Petitioner has submitted computations showing a deficiency for 1951 of $3,767.17 instead of the amount of $5,909.14 determined by the respondent.

The parties are in disagreement over the amount of the excess profits credit based on income for the years 1951 and 1952 determined under section 435, I. R. C. 1939, which is a part of subchapter D added to the Code by the Excess Profits Tax Act of 1950. Subchapter D, as amended by the Revenue Act of 1951, is sometimes referred to as the Korean excess profits tax law as distinguished from the World War II excess profits tax law. Section 435 is lengthy

and highly technical but the part relied upon by petitioner is subsection (g) (3) (A) set out in the margin.[1]

Petitioner contends that the proceeds from the sale of its treasury stock constitute "money * * * paid in for stock" as that phrase is used in the quoted subsection. At first blush, it might appear that there was some merit in petitioner's contention. Petitioner received money from Haas and Newburgh and those individuals received shares of stock in petitioner. We do not think, however, that the solution to the question here presented is that simple.

Respondent points out that the stock received by Haas and Newburgh was treasury stock and as such was an inadmissible[2] asset under his regulations. Section 40.458–5 (e) of Regulations 130 provides:

(e) The purchase by a corporation of its own stock for investment does not of itself result in a reduction of equity invested capital. But see section 40.440–1 relative to inadmissible assets. If, however, the corporation subsequently cancels such stock, equity invested capital is reduced, beginning with the day following such cancellation * * *

Substantially the same provisions were contained in the World War II statute and regulations thereunder. See sec. 720 (a) (1), I. R. C. 1939, sec. 30.720–1 of Regs. 109, and sec. 35.720–1 of Regs. 112. In *Helvering* v. *Winmill*, 305 U. S. 79, the Supreme Court said:

Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law.

We think the regulations referred to herein as to how treasury stock should be treated under this complicated and involved excess profits tax statute are reasonable and should be followed. *Helvering* v. *Winmill, supra.*

In the instant case, the parties have stipulated that "[t]hese common shares were not retired by the petitioner but were held as authorized and issued common shares in its treasury to be sold pursuant to an employment agreement dated July 2, 1948 * * *."

The laws of the State of Illinois clearly permit a corporation organized in that State to purchase its own stock, with some limitations

---

[1] SEC. 435. EXCESS PROFITS CREDIT—BASED ON INCOME.

(g) NET CAPITAL ADDITION OR REDUCTION.

\* \* \* \* \* \* \*

(3) DAILY CAPITAL ADDITION.—The daily capital addition for any day of the taxable year shall, for the purposes of this section, be the sum of the following:

(A) The aggregate of the amounts of money and property paid in for stock * * * after the beginning of the taxable year and prior to such day.

[2] Section 440 (a) (1) (A), I. R. C. 1939, defines the term "inadmissible assets" as meaning "stock in corporations * * *." Section 40.440–1 of Regulations 130 provides that "[s]tock held in the treasury of the issuing corporation is an inadmissible asset" and that "[a]djustments for 'inadmissible assets' are required under * * * section 435 (g), relating to the computation of the excess profits credit under the income method."

not material here, and hold it in its treasury for resale. Sec. 157.6, Ill. Ann. Stats., ch. 32 (Smith-Hurd); *Chetlain* v. *Republic Life Ins. Co.*, 86 Ill. 220 (1877); *Kelly* v. *McCormick-Murray Mfg. Co.*, 201 Ill. App. 308 (1917); *Hess* v. *Aquitania Apartments Co.*, 313 Ill. App. 267, 39 N. E. 2d 724 (1942). Cf. 18 C. J. S. secs. 211, 212; 11 Fletcher, Cyclopedia Corporations sec. 5088; *Kirschenbaum* v. *Commissioner*, 155 F. 2d 23, 25 (C. A. 2, 1946); and *Amelia H. Cohen Trust* v. *Commissioner*, 121 F. 2d 689, 691 (C. A. 3, 1941). In the latter case the court said:

Treasury stock is an asset in the company's treasury and may be resold at any time as suits the corporate owner's purpose, while retired stock ceases to exist as an evidence of interest or ownership in corporate property. *Borg et al.* v. *International Silver Co.*, 2 Cir., 11 F. 2d 147, 150, affirming D. C., 11 F. 2d 143.

In the instant case we think petitioner merely sold an inadmissible asset for cash. We do not think Congress intended the phrase "money * * * paid in for stock" as used in section 435 (g) (3) (A) to apply to "issued" stock which has been purchased by the corporation and held in its treasury for resale as petitioner has done in the instant case. Section 157.2 (j), Smith-Hurd Illinois Annotated Statutes, chapter 32, provides that "[s]hares of its own stock belonging to a corporation shall be deemed to be 'issued' shares * * *." Petitioner carried this stock as an asset in its balance sheets until it was sold in the same way it carried all its other assets. It was included by both parties as a part of the "total assets" in determining the "equity capital" referred to in section 435 (g) (3) (B), I. R. C. 1939.[3] We might say parenthetically if Weill had sold his 900 shares direct to Haas and Newburgh instead of to petitioner, there could have been no "Daily Capital Addition" to petitioner under section 435 (g) (3) (A) for then there would have been simply a substitution of two stockholders for one and the petitioner would have played no direct part in the transaction.

In conclusion, we are of the opinion that the Commissioner's regulations characterizing treasury stock as an inadmissible asset in arriving at the excess profits credit based on income under section 435 are reasonable regulations and as such have the force and effect of law. As the statute spells out the detailed method of determining the excess profits credit and particularly how inadmissible assets should be treated, that method should be followed, and the parties agree, as set forth in paragraph 7 of the stipulation of facts, quoted in our

---

[3] SEC. 435. EXCESS PROFITS CREDIT—BASED ON INCOME.

(g) NET CAPITAL ADDITION OR REDUCTION.

\* \* \* \* \* \* \*

(3) DAILY CAPITAL ADDITION.—The daily capital addition for any day of the taxable year shall, for the purposes of this section, be the sum of the following:

\* \* \* \* \* \* \*

(B) The amount, if any, by which the equity capital (as defined in section 437 (c)) at the beginning of the taxable year exceeds the equity capital at the beginning of the taxpayer's first taxable year under this subchapter.

findings, that to the extent the cash proceeds from the sale of the shares of stock in 1951 and 1952 were converted to operating assets in accordance with the rules prescribed in subsections 435 (g) (9) and 435 (g) (10), the Commissioner did increase the petitioner's net capital addition for the taxable year. We do not believe that these long-standing regulations should be held invalid. It follows that it would be improper to treat the money paid for the treasury shares as "money * * * paid in for stock" as that phrase is used in section 435 (g) (3) (A).

Reviewed by the Court.

*Decision will be entered for the respondent.*

FORRESTER, *J.*, concurs in the result.

---

MURDOCK, *J.*, dissenting: The only issue here is—what effect upon the credit under section 435 (g) (3) (A) had the payment to the corporation of $26,460.06 on January 9, 1951, for 282 shares of its stock and the payment to the corporation of $44,663.08 on January 15, 1952, for 476 shares of its stock. Section 435 (g) (3) (A) provides that "[t]he daily capital addition for any day of the taxable year shall" include "(A) The aggregate of the amounts of money * * * paid in for stock * * * after the beginning of the taxable year and prior to such day." The amounts here in question had been paid in to the corporation for its stock after the beginning of each of the taxable years 1951 and 1952, and prior to every succeeding day in each of those years. Thus, under the plain words of the provision the petitioner's contention is correct.

The payment of the amounts here in question caused the shares to cease to be treasury stock and to cease to be "inadmissible assets" of the corporation for the purpose of the computation of the credit. The discussion in the majority opinion of how treasury stock affects the computation of the credit is beside the only point in issue.