COLT'S MANUFACTURING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59184. Filed October 21, 1960.

*James R. Cherry, Esq., Samuel P. Cohen, Esq.,* and *Morris Shilensky, Esq.,* for the petitioner.

*James E. Markham, Jr., Esq.,* for the respondent.

BRUCE, *Judge:* The respondent determined a deficiency in petitioner's income tax for the taxable year 1952 in the amount of $39,227.88. In his deficiency notice respondent allowed a deduction for the additional Connecticut State corporation excise tax which resulted from respondent's adjustment of petitioner's net income. By amended answers respondent alleged error in the allowance of this deduction and claimed additional deficiencies in the amounts of $6,395.21 and $3,296.05, making the total amount in controversy $48,919.14.

The issues presented are:

(1) Whether, in the computation of petitioner's excess profits tax under the invested capital method for the year 1952, petitioner's reacquired stock is includible in its total assets and inadmissible assets; and

(2) Whether petitioner, an accrual basis taxpayer, is entitled to a deduction for the additional Connecticut State corporation excise tax for 1952 as a result of respondent's adjustment of petitioner's income for the year 1952.

### FINDINGS OF FACT.

Some of the facts were stipulated and the stipulation, together with the exhibits attached thereto, is incorporated herein by this reference.

The petitioner, a manufacturer of small arms, was incorporated in 1855 by a special act of the General Assembly of the State of Connecticut as "Colt's Patent Fire-Arms Manufacturing Company," and its name changed in 1947 to "Colt's Manufacturing Company." Its principal office is in Hartford, Connecticut.

At all times material hereto petitioner kept its books and filed its tax returns on an accrual basis. Petitioner's Federal income and excess profits tax return for the taxable year 1952 was filed with the district director of internal revenue for the district of Connecticut.

At all times material hereto, petitioner was authorized to issue 400,-000 shares of common stock at a par value of $25 per share, and 200,000 of such 400,000 authorized shares of stock had been issued.

By an act of the January 1923 session of the Connecticut General Assembly (approved April 19, 1923), amending petitioner's charter, petitioner was authorized, "in the discretion of its directors, [to] purchase and hold shares of its capital stock for the purpose of resale from time to time to employees of the company, provided the shares so held by the company shall at no time exceed five per centum of its capital stock issued and outstanding."

By an act of the January 1947 session of the General Assembly (approved April 16, 1947), amending petitioner's charter, petitioner was authorized, "in the discretion of its directors, [to] sell or otherwise dispose of the shares of its capital stock heretofore acquired, pursuant to the [amendment to petitioner's charter approved April 19, 1923] at such time or times and to such persons, firms or corporations and in such manner as to the said board of directors may seem advisable." Pursuant to the 1923 act petitioner acquired 4,100 shares of its outstanding stock prior to 1949, at a total cost of $109,394.

Petitioner's charter was further amended by an act of the general assembly, approved April 25, 1949, which empowered petitioner "to amend its charter in the same manner and to the same extent that a corporation organized under the general corporation law has power to amend its certificate of incorporation."

Due to the extraordinary business activity in arms manufacture during World War II, petitioner accumulated a large surplus. As of December 31, 1949, the book value or net worth of the petitioner, as shown on its financial statements, was $13,172,829, and its net working capital was $10,320,582, of which at least $7,726,118 was in cash or cash equivalent. For some time prior to 1950, petitioner had been investigating the possibility of distributing part of its surplus funds in such a manner that the receipt thereof by its stockholders would have the minimal tax consequences. In 1948 a group of stockholders commenced solicitation of proxies for the election of directors in opposition to management's nominees in order to invoke ways and means of directing a distribution of a substantial portion of petitioner's surplus. Several members of this group were subsequently elected as directors.

At the regular monthly meeting of petitioner's board of directors held on February 24, 1950, it was—

VOTED: That a special meeting of the stockholders of the Company be held on March 29, 1950 * * * for the purpose of acting upon a proposal to authorize the Directors of the Company to purchase or otherwise acquire outstanding shares of the capital stock of the Company and to hold, sell, exchange, transfer

or retire said shares, from time to time, to such an extent, in such manner and upon such terms as the Directors may deem advisable; * * *

In connection with the foregoing special meeting of stockholders, the matter of soliciting tenders of stock was given further consideration, * * * and * * * it was

VOTED: That in the notice of stockholders of the special meeting to be held on March 29, 1950, the stockholders be advised that in the event the stockholders approve the proposal to be voted on at said special meeting, the Board will shortly thereafter solicit tenders of the Company's capital stock at prices to be offered by stockholders, but in no event to exceed $53.00 per share * * * and that in purchasing shares of the Company's capital stock the Board will in no event expend more than $7,000,000 or an amount in excess of a sum which would reduce the operating capital of the Company below an amount adequate for its normal operations; * * *

The regular monthly meeting of petitioner's board of directors held on March 23, 1950, passed additional resolutions implementing the submission of the stock tender plan to the stockholders.

The stock tender plan was submitted to a special meeting of the petitioner's stockholders held March 29, 1950, and adopted by the affirmative vote of stockholders holding more than three-fourths of petitioner's outstanding stock. Petitioner's directors were expressly authorized:

to purchase or otherwise acquire outstanding shares of the capital stock of the Company and to hold, sell, exchange, transfer or retire said shares, from time to time, to such an extent, in such manner and upon such terms as the Directors may deem advisable.

Pursuant to the approval of petitioner's stockholders, petitioner, in May 1950, acquired 124,827 shares of its capital stock at a cost of $6,524,167.82. The stock of the stockholders and directors who had opposed management was included in these purchases and said directors did not thereafter actively participate in the management of the corporation.

On July 18, 1951, petitioner acquired assets from Walter P. Jacobs Industries, Inc., in exchange for 8,927 shares of the stock which had been reacquired. On December 18, 1952, petitioner retired the 120,000 remaining reacquired shares.

In its books and records petitioner referred to the reacquired stock as treasury stock, and did not treat it as either an asset or a liability. Petitioner did not vote these shares, nor were dividends paid thereon.

On December 31, 1951, and at all times until their formal retirement on December 18, 1952, petitioner held the 120,000 shares of stock in its treasury.

Petitioner computed its excess profits tax credit for the taxable year 1952 under the invested capital method provided for by section 436, I.R.C. 1939, excluding the treasury stock from its computation of both assets and inadmissible assets, as follows:

| | | |
|---|---|---:|
| Total assets (per return) | | $11,089,854.92 |
| *Credit:* | $5 million at 12 per cent | 600,000.00 |
| | $5 million at 10 per cent | 500,000.00 |
| | Balance at 8 per cent | 87,188.39 |
| Tentative credit | | 1,187,188.39 |
| *Less:* Reduction on account of inadmissible assets | | 101.75 |
| Net excess profits credit | | 1,187,086.64 |

Respondent, in determining a deficiency for the taxable year 1952, included the treasury stock under both assets and inadmissible assets, as follows:

| | | |
|---|---|---:|
| Total assets (as adjusted and including cost of redeemed shares) | | $17,202,381.36 |
| *Credit:* | $5 million at 12 per cent | 600,000.00 |
| | $5 million at 10 per cent | 500,000.00 |
| | Balance at 8 per cent | 576,190.51 |
| Tentative credit | | 1,676,190.51 |
| *Less:* Reduction on account of inadmissible assets | | 635,519.20 |
| Net excess profits credit | | 1,040,671.31 |

### OPINION.

This case arises under the provisions of the Excess Profits Tax Act of 1950, made effective with respect to taxable years ending after June 30, 1950, which added subchapter D (sections 430 to 472, inclusive) to the Internal Revenue Code of 1939.[1] The principal issue presented relates to the computation of the excess profits credit allowable to petitioner for the taxable year 1952, more specifically, whether, for the purpose of computing petitioner's excess profits credit under the invested capital method as provided by section 436,[2] 120,000 shares of stock which petitioner had reacquired are includible in its total assets under section 437[3] and in inadmissible assets under section 440.[4]

---

[1] All references to the statutes, unless otherwise indicated, are to the Internal Revenue Code of 1939.

[2] SEC. 436. EXCESS PROFITS CREDIT—BASED ON INVESTED CAPITAL.

(a) GENERAL RULE.—In the case of a domestic corporation * * * the excess profits credit for any taxable year computed under this section shall be the sum of the following:

(1) The invested capital credit computed under section 437, reduced by the amount computed under section 440(b) (relating to inadmissible assets), * * *

[3] SEC. 437. INVESTED CAPITAL CREDIT.

(a) DEFINITION.—The invested capital credit for any taxable year shall be the amount shown in the following table:

If the invested capital for such year (as defined in subsection (b)(1)) is: / The credit shall be:

| If the invested capital for such year (as defined in subsection (b)(1)) is: | The credit shall be: |
|---|---|
| Not over $5,000,000 | 12% of the invested capital. |
| Over $5,000,000 but not over $10,000,000 | $600,000, plus 10% of the excess over $5,000,000. |
| Over $10,000,000 | $1,100,000 plus 8% of the excess over $10,000,000. |

Although both parties treat the 120,000 shares of stock involved herein, which had been reacquired by petitioner, as treasury stock, petitioner argues that the repurchase of this stock should be treated as a capital reduction. "Treasury stock" is generally defined as shares of the capital stock of a corporation which have been legally issued and thereafter reacquired by the corporation and not formally retired. See Accountants' Handbook, sec. 21.32 (4th ed.); Hills, Law of Accounting and Financial Statements, 141. Accordingly, we consider the stock involved herein as treasury stock.

Respondent and petitioner, on brief, have used different approaches to the principal issue involved.

Respondent argues that the treasury stock is to be considered an inadmissible asset. In support of this argument he relies upon section 40.440–1(b) of Regulations 130 [5] which expressly provides that "Stock

----

(b) INVESTED CAPITAL.
(1) ELECTION OF TAXPAYER.—The invested capital for any taxable year shall be the adjusted invested capital determined under paragraph (2), * * *.
(2) ADJUSTED INVESTED CAPITAL.—The adjusted invested capital for any taxable year (hereinafter in this paragraph referred to as "the taxable year") shall be the sum of—
(A) the equity capital (as defined in subsection (c)) as of the beginning of the taxable year;
(B) the capital addition for the taxable year computed under subsection (d);
(C) 75 per centum of the average borrowed capital for the taxable year computed under section 439(a); and
(D) the recent loss adjustment computed under subsection (f),
minus the capital reduction for the taxable year computed under subsection (e). * * *
*　　*　　*　　*　　*　　*　　*
(c) DEFINITION OF EQUITY CAPITAL.—The equity capital of the taxpayer as of any time shall be the total of its assets held at such time in good faith for the purposes of the business, reduced by the total of its liabilities at such time. For such purposes, the amount attributable to each asset shall be determined by ascertaining the adjusted basis thereof (or, in the case of money, the amount thereof) and the adjusted basis shall be the adjusted basis for determining gain upon sale or exchange. * * *
*　　*　　*　　*　　*　　*　　*
(e) CAPITAL REDUCTION FOR THE TAXABLE YEAR.—The capital reduction for the taxable year shall be the aggregate of the daily capital reduction for each day of the taxable year, divided by the number of days in such year. The daily capital reduction for each day of the taxable year shall be the amount of the distributions previously made during the taxable year which are not out of the earnings and profits of such taxable year.
[4] SEC. 440. ADMISSIBLE AND INADMISSIBLE ASSETS.
(a) DEFINITIONS.—For the purposes of this subchapter—
(1) The term "inadmissible assets" means—
(A) Stock in corporations, except stock in a foreign personal holding company, and except stock which is not a capital asset;
*　　*　　*　　*　　*　　*　　*
(2) The term "admissible assets" means all assets other than inadmissible assets.
(b) RATIO OF INADMISSIBLES TO TOTAL ASSETS.—In the case of any amount which is required to be reduced by reference to this subsection, the reduction shall be the same percentage of such amount as the percentage which the total of the inadmissible assets is of the total of admissible and inadmissible assets. * * *
[5] Regs. 130:
Sec. 40.440–1. Admissible and inadmissible assets.
*　　*　　*　　*　　*　　*
(b) The term "inadmissible assets" means (1) stock in all corporations, domestic or foreign, except stock in a foreign personal holding company, and except stock which is not a capital asset (such as stock held primarily for sale to customers by a dealer in securities), and (2) all obligations described in section 22(b)(4), any part of the interest from which is excludible from gross income or allowable as a credit against net income. Stock held in the treasury of the issuing corporation is an inadmissible asset. The term "admissible assets" means all assets other than inadmissible assets.

held in the treasury of the issuing corporation is an inadmissible asset," and upon *Sandoval Zinc Co.*, 29 T.C. 1055, 1059, which held that "the Commissioner's regulations characterizing treasury stock as an inadmissible asset in arriving at the excess profits credit based on income under section 435 are reasonable regulations and as such have the force and effect of law."

Respondent also argues that the treasury stock in question is to be considered an asset, in view of the provisions of section 440 which define the term "inadmissible assets," *inter alia*, as "Stock in corporations, except stock in a foreign personal holding company, and except stock which is not a capital asset." While conceding that treasury stock is not generally considered an asset in accounting theory and practice (see Accountants' Handbook, sec. 21.32-34 (4th ed.) ; *id.* at 934 (2d ed.)), respondent argues that a distinction must be made between accounting and income tax purposes, citing section 29.22(a)-15, Regs. 111, which states that whether the acquisition or disposition by a corporation of its own shares gives rise to a taxable gain or deductible loss depends on the real nature of the transaction, and *Helvering* v. *Edison Bros. Stores, Inc.*, 133 F. 2d 575, 579, certiorari denied 319 U.S. 752, wherein the Court stated:

In the construction of the revenue acts in question here, and of the administrative regulations interpreting them, we may put aside as not controlling the meaning of income in the language of accountancy and economics.

Petitioner, on the other hand, contends that the treasury stock in question is neither an asset nor an inadmissible asset. In support of its contention that it is not an asset, petitioner first argues that the purchase of its issued stock by the corporation constituted a capital reduction within the meaning of section 437(e) and therefore, under the provisions of section 437(b), is not to be included in its invested capital on which the excess profits credit here involved is based. Petitioner further argues that the treasury stock in question is not to be included in "the total of its assets" within the meaning of section 437(c) defining equity capital, for the reason that it was not purchased for investment purposes and was not "held at such time in good faith for the purposes of the business."

Petitioner also argues that neither the literal language of section 440, the purpose of the Act, the history of the law, nor the expressed intention of Congress permits the characterization of treasury stock as an inadmissible asset and, accordingly, that the treasury stock in question does not constitute an "inadmissible asset."

The reason that the approach taken by respondent and the approach taken by petitioner result in different amounts of excess profits credit is because a capital reduction is made from invested capital before application of the varying percentages to obtain the invested capital

credit, whereas the reduction for inadmissible assets is a ratio applied after the computation of the credit.

The legislative history of the Excess Profits Act discloses no explanation of the reason for this less favorable treatment with respect to inadmissible assets. The World War II law did not make the same distinction as the Korean Act. Nevertheless the law is clear in requiring different adjustments in the two situations and neither party argues to the contrary. We are not concerned with the equity or lack of equity of the law in making such a distinction, but with a determination under the law as enacted whether this treasury stock is an asset and an inadmissible asset, or whether the transaction surrounding the acquisition and holding of this stock is such that it should be considered the same as if the stock were retired upon its acquisition and thus constitutes a capital reduction.

Section 436, insofar as pertinent, provides that, in the case of domestic corporations, the excess profits credit, based on invested capital, shall be the *invested capital credit* computed under section 437, reduced by the amount computed under section 440(b) (relating to inadmissible assets). Section 437 defines invested capital credit (except where the taxpayer has elected to use historical invested capital) in terms of designated percentages of *adjusted invested capital*. Adjusted invested capital for any taxable year is defined as including the *equity capital* as defined in subsection (c), minus the capital reduction computed under subsection (e), and equity capital is defined in subsection (c) as follows:

The equity capital of the taxpayer as of any time shall be the total of its assets held at such time in good faith for the purposes of the business, reduced by the total of its liabilities at such time.

See also section 40.437–5(b)(1), Regs. 130, which provides, *inter alia*, that "Treasury stock purchased for investment and held in good faith for the purposes of the business is included in total assets," and section 40.437–5(c), which provides, *inter alia*, that "The obligation of the taxpayer on its capital stock is not a liability."

Thus, in the final analysis, the determination of the principal issue herein turns first upon the question whether petitioner's treasury stock was held during the period involved "in good faith for the purposes of the business."

Petitioner contends that the stock in question was not purchased for investment nor held for the purposes of the business, but was purchased for the dual purpose of buying out dissident directors and effecting a distribution to stockholders of cash, free of ordinary personal income tax. We agree that to the extent it was not purchased with the intent to resell it at a profit, the stock was not purchased for investment purposes. On the evidence presented, however, we are unable to find

that it was not held, until retired on December 18, 1952, for business purposes.

It is to be noted that the requirement of the statute is that the asset be "held in good faith for the purposes of the business." Thus whether the reason for the acquisition of the stock was for a business purpose of the corporation is important only insofar as it might indicate whether the subsequent holding of the stock by petitioner was for a business purpose.

It is not shown by the evidence presented that there was any intention on the part of any of the parties concerned, at the time the stock was acquired by petitioner, to cancel or retire the stock. Four thousand one hundred shares were acquired prior to 1949 (according to the petition, prior to April 16, 1947) pursuant to the amendment of the corporation's charter approved April 19, 1923, which permitted petitioner, in the discretion of its directors, to purchase and hold at any one time not more than 5 per cent of the issued and outstanding shares of its capital stock for the purpose of reselling the same to its employees. This restriction upon the disposition of such stock was subsequently removed by an act of the general assembly approved April 16, 1947, which authorized the company, in the discretion of its directors, to "sell or otherwise dispose of the shares of its capital stock heretofore acquired, * * * at such time or times and to such persons, firms or corporations and in such manner as to said board of directors may seem advisable." Thereafter, and until disposed of in the manner hereinafter mentioned, such shares were held "in good faith for the purposes of the business."

On March 29, 1950, and in conformity with section 5181 of the General Statutes of Connecticut,[6] a resolution was adopted by stockholders owning more than three-fourths of petitioner's outstanding stock, authorizing its directors to purchase or otherwise acquire outstanding shares of the capital stock of the company at a price not to exceed $53 per share and a total acquisition not to exceed $7 million, and "to hold, sell, exchange, transfer or retire said shares, from time to time, to such an extent, in such manner and upon such terms as the Directors may deem advisable." Pursuant to this authorization, in May 1950, petitioner acquired 124,827 shares of its capital stock at a cost of $6,524,167.82. Upon the acquisition of such shares peti-

---

[6] Section 5181 of the General Statutes of Connecticut (1949 rev.) provides, in part, as follows:

No corporation shall acquire, purchase and hold its own stock * * *, except with the approval of stockholders owning three-fourths of its entire outstanding capital stock given at a stockholders' meeting warned and held for that purpose; and such corporation shall not vote upon shares of its own stock. * * * The president and treasurer of each corporation acquiring its own stock under the provisions of this section shall, within six months thereafter, make, sign and swear to and file in the office of the secretary of state a certificate stating the number of shares of its own stock so acquired, and the secretary shall thereupon record such certificate in a book kept by him for that purpose.

tioner then owned an aggregate of 128,927 shares of its own stock which it held in its treasury, subject to being sold, exchanged, transferred, or retired at the discretion of its directors. There is no evidence of any decision by the directors as to the disposition to be made of such shares prior to July 18, 1951. On the latter date 8,927 shares of the reacquired stock were used to acquire assets of the Walter P. Jacobs Industries, Inc. The remaining 120,000 shares continued to be held in the treasury until December 18, 1952, on which date, pursuant to a resolution of petitioner's board of directors, they were retired and canceled.

There is no showing that prior to the retirement of the 120,000 shares on December 18, 1952, they were not being held "in good faith for the purposes of the business," within the meaning of section 437(c). Since the stock was held in the treasury "in good faith for the purposes of the business" and was not canceled or retired prior to December 18, 1952, the distribution of cash in May 1950, did not result in a capital reduction, within the meaning of section 437(b)(2), as contended by petitioner. Accordingly, we hold that the 120,000 shares of stock in question are includible in the total assets of the petitioner for the purpose of computing its excess profits credit, based on invested capital, as provided by section 436.

It necessarily follows, and we so hold, that the 120,000 shares of stock are also to be included in inadmissible assets under section 440. This clearly results under the provisions of section 440(a)(1)(A) which defines the term "inadmissible assets" as "Stock in corporations, * * * except stock which is not a capital asset."

*United States* v. *Anderson, Clayton & Co.*, 350 U.S. 55, relied upon by petitioner, does not, in our opinion, require a different conclusion. In that case, a corporation, pursuant to an agreement having as its purpose the restriction of stock ownership to its management group, purchased the stock of a deceased official, held it for a time in its treasury, and subsequently sold it to other officials at a substantial profit to the corporation. The question there was whether, under such circumstances, section 29.22(a)–15, Regs. 111, made the sale of this treasury stock a taxable transfer under section 22(a). Section 29.22(a)–15 of Regulations 111 provides that "Whether the acquisition or disposition by a corporation of shares of its own capital stock gives rise to taxable gain or deductible loss depends upon the real nature of the transaction, which is to be ascertained from all its facts and circumstances." It further provides that "if a corporation deals in its own shares as it might in the shares of another corporation, the resulting gain or loss is to be computed in the same manner as though the corporation were dealing in the shares of another. The Supreme Court held that "When viewed in its entirety, the instant

transaction, limited to a wholly intracorporate purpose with no element of speculation or gain envisioned from dealing in its shares, does not constitute dealing by the corporation in its own shares as it might deal in the shares of another corporation within the meaning of the regulation."

We are not concerned here with the question whether petitioner sustained a taxable gain or deductible loss upon its disposition of the treasury stock. That question may have been present in connection with the transfer of 8,927 shares of its treasury stock for assets of the Jacobs company in 1951 but it is not presented here. Nor are we concerned here with the tax consequences to the stockholders whose shares were acquired by petitioner. The question with which we are concerned here is whether, during the period involved, shares of its own stock which the corporation had reacquired were held in its treasury in good faith for the purposes of its business. Viewing the transactions involved in their entirety, we have concluded that until exchanged in part for other assets in 1951 and the remaining portion canceled and retired on December 18, 1952, petitioner held the treasury stock "in good faith for the purposes of the business," subject to its being sold, exchanged, transferred, or retired, within the discretion of its directors. The exchange of 8,927 shares in 1951 for assets of another corporation, the express language of the resolution authorizing the purchase, and the complete lack of evidence on the part of petitioner explaining why the stock in question was not retired for a period of 2½ years after its purchase compel the conclusion that the stock was held in good faith for the purposes of petitioner's business.

The second issue is whether or not petitioner, an accrual basis taxpayer, is entitled to a deduction for the accrual of an additional Connecticut State excise tax (as based on income) in the amount of $7,799.03 for the taxable year 1952, which deduction resulted from respondent's adjustment of petitioner's net income for the same taxable year.

Respondent's notice of deficiency allowed the aforesaid deduction, but by amended answer respondent alleged that his allowance of this deduction was erroneous because:

8. (c) In the taxable year 1952 petitioner did not accept any of the adjustments increasing its net income for the taxable year 1952 and none of said adjustments was finally determined in said taxable year; hence, petitioner is not entitled in the taxable year 1952 to the additional deduction for Connecticut excise tax in the amount of $7,799.03.

Where a corporation in the State of Connecticut is on an accrual basis, the deduction for State excise taxes based on net income is allowable for Federal income tax purposes in the taxable year in which the

income is earned. G.C.M. 9774, X–2 C.B. 137 (1931); I.T. 2935, XIV–2 C.B. 91 (1935).

The general rule applicable in the instant case was stated in *Jack M. Chesbro*, 21 T.C. 123, affd. 225 F. 2d 674, certiorari denied 350 U.S. 995, at page 130, to be as follows:

The corporation, using an accrual method of accounting, is entitled to accrue additional franchise tax based upon any adjustment made by the Commissioner increasing its income which is proper and which it has not contested, but it is not entitled to accrue franchise tax on additional income improperly added by the Commissioner or added by the Commissioner and contested by the taxpayer. *Curran Realty Co.*, 15 T.C. 341. * * *

The facts in *Curran* are similar to the facts in the instant case. In that case the Commissioner adjusted the taxpayer's income, allowed additional deductions for the Massachusetts excise tax to include the excise tax which would be applicable to the increased income, and by amended answer alleged that he had erred in allowing said additional deduction. As to one of the income adjustments, which was contested by the petitioner, the deduction for the increased excise tax was disallowed. As to the other adjustments the Court said, at page 344: "The Commissioner, who raised this issue, has not shown that the petitioner disputed any other proper adjustment and the additional Massachusetts tax based on those adjustments was properly allowed as a deduction."

Respondent contends that his adjustment to petitioner's income was disputed by petitioner and that therefore the deduction for the additional Connecticut excise tax must be disallowed. In support of this contention respondent would use the wording of the petition which states in paragraph 3: "The deficiencies as determined by the Commissioner, all of which are in dispute * * *." However, a reading of the entire petition indicates that only the excess profits credit for 1952, and not the net income for that year, is in dispute. The respondent, who raised the issue by amended answer, has therefore not shown that petitioner disputed the income adjustment, and the consequent additional deduction for excise tax must be allowed.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

––––––––––

MURDOCK, *J.*, dissenting: This petitioner acquired 120,000 shares of its own $25-par-value capital stock in May 1950 by the payment of over $6 million of its cash to the former owners of those shares. The payment for each $25-par-value share averaged over $52 per share. The majority opinion holds that the total assets of this corporation in 1952 included those 120,000 shares at a value of over $6 million. A tentative excess profits credit is computed by taking 12 per cent of the

first $5 million, 10 per cent of the second $5 million, and 8 per cent of the balance of the total assets. The 120,000 shares next are regarded as "inadmissible assets" and about 35 per cent of the total assets being "inadmissible assets" (principally, if not entirely, the 120,000 shares of its own stock), the tentative credit is reduced by this percentage. This results in a credit which is less by a substantial amount than the credit would be if the 120,000 shares of its own capital stock had not been regarded as assets of the petitioner. *Sandoval Zinc Co.*, 29 T.C. 1055, is cited for the proposition that a corporation's own stock once issued, reacquired and held as treasury stock, is an "inadmissible asset." I dissented in the case.

Section 436, under which this credit is allowed, is entitled "Excess Profits Credit—Based on Invested Capital." The petitioner here, having paid over $6 million to the former stockholders for the 120,000 shares of its own stock, obviously had less assets and less invested capital thereafter than it had before. The more than $6 million of cash which it paid for those shares was an asset, but was no longer an asset when the corporation parted with it. Its own shares which it thus acquired were not assets in any real sense and certainly no longer represented any capital invested in the corporation. The credit involved here is to be computed on the invested capital of the corporation, and it seems obvious that the $6 million included in total assets and included in "inadmissible assets," representing these 120,000 shares, does not represent any invested capital, does not represent an asset of the corporation, and should not enter into the computation either of total assets or "inadmissible assets" in the computation of the credit in question.

PIERCE, *J.*, agrees with this dissent.

———

DRENNEN, *J.*, dissenting: I do not think the 120,000 shares of its own stock purchased by the corporation was an asset "held at such time in good faith for the purposes of the business" within the meaning of section 437(c) defining equity capital, and therefore should not be included in the computation of the invested capital credit.

PIERCE, *J.*, agrees with this dissent.