H. E. HARMAN COAL CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 23285. Promulgated April 18, 1951.

*George E. H. Goodner. Esq.*, and *Scott P. Crampton, Esq.*, for the petitioner.

*George J. LeBlanc, Esq.*, for the respondent.

OPINION.

VAN FOSSAN, *Judge:* There are six issues to be decided in this controversy. The first issue centers around the sale by petitioner of certain railroad tracks to the Norfolk & Western Railroad during the year 1945. It involves the determination of whether petitioner, in fact, realized taxable gain from the sale of its so-called delivery or run-around tracks to the Norfolk & Western on May 4, 1945, and, if any, the amount thereof, and whether petitioner sustained a deductible loss on the sale of its so-called tipple or sidetracks to the same purchaser on December 27, 1945.

The testimony herein indicates that there were two separate transactions between petitioner and the Norfolk & Western during the year 1945. These transactions resulted in the sale of all of petitioner's railroad tracks. The respective sales were negotiated at different times and for different reasons. The negotiations for the acquisition of the delivery tracks were instituted because it had been at all times the policy of the Norfolk & Western to construct, own, and maintain such tracks. The reason this policy had not been followed in petitioner's case is not shown in the record. However, when the fact that such

tracks were owned by petitioner came to the attention of Norfolk &. Western's management, it was decided that an effort should be made to purchase them. Accordingly, negotiations were instituted that culminated in the sale of petitioner's delivery tracks to the Norfolk & Western for a consideration of $29,200. This amount was believed by both parties to represent the fair value thereof and was the approximate book value of the tracks as of January 1, 1945. This latter date was shortly before the beginning of negotiations between the parties. Both petitioner and respondent now assert on brief that the gain realized from the transaction was in the amount of $1,299.95. The record supports such assertion, and we so hold.

The acquisition by the railroad of the tipple tracks was for an entirely different reason. At about the same time as the Norfolk & Western purchased petitioner's tipple tracks, it also purchased the tipple tracks of other coal mines in the vicinity of petitioner's mine. These other purchases were made for the same consideration and for the same reason. The record discloses that prior to World War I, the Norfolk & Western had no uniform policy with respect to the ownership and maintenance of the tipple tracks at mines served by it. In some cases the railroad owned and maintained such tracks while in others the mine owners were required to do so. Between 1918 and 1920, the period during which railroads were under control of the Federal authorities, it was the policy to require that such tipple tracks be constructed and maintained by the mine operators. The Norfolk & Western followed such a policy after Federal controls were ended and continued to do so until the middle of 1945. Because of inadequate maintenance there had been many accidents causing damage of the railroad's equipment and injury to its personnel. Accordingly, the railroad decided that the tipple tracks should be in all cases owned and maintained by it. Negotiations were thereupon commenced for the acquisition of such tracks. These negotiations included and resulted in the sale of petitioner's tipple tracks to the Norfolk & Western for the consideration of $1 plus a license to use such tracks and an agreement relieving it of the expense of maintaining the tracks. Petitioner maintains that it sustained a loss on the transaction and that it is entitled, under section 23 (f) of the Internal Revenue Code,[1] to deduct the amount by which the adjusted basis of the property sold exceeded the cash value received. In support of this contention petitioner cites *Standard Envelope Mfg. Co.*, 15 T. C. 41, as a parallel case and urges that under the rationale of that case the deduction sought should be allowed.

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

    *        *        *        *        *        *        *

    (f) Losses by Corporations.—In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise.

The case cited has but a superficial resemblance to the case before us. In that case the consideration for property sold, in addition to a lease back agreement was an amount which the testimony of expert witnesses showed to be close to its fair appraisal value. On the other hand, the consideration received by petitioner on the sale of its tipple tracks to the Norfolk & Western was $1, plus a license to use them and an agreement relieving it of the expense of maintaining them. One could not seriously assert that $1 represented a fair appraisal of the value of tracks or was the full extent of the value received by petitioner. Absent compulsion, a reasonably prudent business man would not be expected to sell property for less than its cash value unless other considerations equal to or exceeding the value of the property sold were also to be received. The record does not indicate the existence of such compulsion. Rather, it shows that the cost of maintaining these tracks was substantial and, from petitioner's position, that relief therefrom was a primary consideration in their sale. Certainly, there is some value to be placed upon the agreement relieving petitioner of this burden. Moreover, the license granted petitioner enabling it to use the tracks without cost is also of some value. Petitioner could not operate its mine unless it had access to these tracks.

Consideration of the substance of the transaction here in question discloses petitioner's beneficial use of the tipple tracks was substantially the same after the sale as it was before. The agreement of Norfolk & Western to permit the use of such tracks to petitioner without the burden of maintaining them, if anything, resulted in an improvement of petitioner's economic position. Actually, the sole effect of the transaction was the transfer of legal title to personal property which had no use other than to serve petitioner's mine. Petitioner has failed to show that its economic position has been in any way adversely affected as a result of this transaction. The record does not contain information which will enable us to place any evaluation upon the agreement of Norfolk & Western to maintain the tracks. Therefore, petitioner has not shown that the consideration received by it for the transfer of legal title to the tracks was less than its adjusted basis and that any loss was actually sustained by it. In the absence of such a showing, petitioner must fail as to this issue. Accordingly, we hold that the respondent did not err in his determination that petitioner did not sustain a deductible loss in the above transaction.

The next question is whether the petitioner may deduct from gross income as ordinary and necessary expenses the cost of certain equipment purchased by it during 1944 and 1945. The facts show that this equipment, which included conveyors, loaders, mining machinery, mine cars, and electric mine jeeps, was acquired by petitioner in an attempt to maintain its production as the working faces in its mine receded.

Since the opening of petitioner's mine in 1934, the number of working faces or places of operation had gradually increased until by 1944 and 1945 they were widely separate and scattered throughout an area approximating twenty square miles. The length of the average haul had increased substantially. The recession of the working faces had brought petitioner to an area where the coal seam was thinner and had layers of foreign matter in it. The mine had previously been developed to its full productive capacity, and petitioner, in an effort to maintain that capacity, acquired the mine equipment set out above. This equipment included a new type machine to mine the thin coal, as well as duplications of machinery already owned, in order to make it available at the increasing number of working faces. These expenditures were deducted from gross income by petitioner as expenses incurred in operating the mine. Respondent has disallowed such expenditures as deductions on the ground that they constituted capital investments.

Ordinarily, the development expenditures in the case of mines are divided into two classes: (a) Those expenditures made during the development stage in excess of net receipts from minerals sold, and (b) expenditures for plant equipment and for replacements not including expenditures for maintenance and ordinary and necessary repairs. Both types are capitalized and recovered through depreciation. See Regulations 111, section 29.23(m)-15(a) and (b).[2]

However, it often becomes necessary to make expenditures for equipment that would ordinarily be considered a capital asset, in order to maintain the normal output of the mine, solely because of the recession of the working faces of the mine. If such expenditures do not increase the value of the mine, if they do not decrease the cost of producing mineral units, or if they do not represent an amount expended in restoring property or making good the exhaustion thereof for which an allowance has been made, it has been held that such items are deductible as ordinary and necessary business expenses. E. g., *Marsh Fork Coal Co.* v. *Lucas*, 42 F. 2d 83; *United States* v. *Roden Coal Co.*, 39 F. 2d 425; see Regulations 111, footnote 2, *supra*.

---

[2] Regulations 111, Sec. 29.23(m)-15. ALLOWABLE CAPITAL ADDITIONS IN CASE OF MINES.— (a) All expenditures in excess of net receipts from minerals sold shall be charged to capital account recoverable through depletion while the mine is in the development stage. The mine will be considered to have passed from a development to a producing status when the major portion of the mineral production is obtained from workings other than those opened for the purpose of development, or when the principal activity of the mine becomes the production of developed ore rather than the development of additional ores for mining.

(b) Expenditures for plant and equipment and for replacements, not including expenditures for maintenance and for ordinary and necessary repairs, shall ordinarily be charged to capital account recoverable through depreciation. Expenditures for equipment (including its installation and housing) and for replacements thereof, which are necessary to maintain the normal output solely because of the recession of the working faces of the mine, and which (1) do not increase the value of the mine. or (2) do not decrease the cost of production of mineral units, or (3) do not represent an amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made, shall be deducted as ordinary and necessary business expenses.

The principle of expensing such equipment and allowing a deduction therefor has also been upheld in such cases as *Commissioner* v. *Brier Hill Collieries*, 50 F. 2d 777 (involving steel rails, mine cars, switches, and trolley wires) ; *Preston County Coke Co.*, 24 B. T. A. 646 (involving steel rails, blending machinery and mining machinery) ; *West Virginia-Pittsburgh Coal Co.*, 24 B. T. A. 234 (involving steel rails, mine locomotives, mine cars, mules, motors, pumps, etc.) ; *Tennessee Consolidated Coal Co.*, 24 B. T. A. 369 (involving electric locomotive, mine rails, etc.) ; and *W. M. Ritter Lumber Co.*, 30 B. T. A. 231 (involving mine cars, locomotives, mining machinery, motors, etc.).

We are unable to distinguish the character of most of the expenditures made by petitioner from those involved in the foregoing cases. Accordingly, under their authority the items here involved must be allowed as ordinary and necessary expense deductions. We are of the opinion, however, that the petitioner has failed to establish that the tipple alterations made during the years under review fall into the class of those items above mentioned. The tipple alterations constituted capital improvements and the respondent is sustained in disallowing deductions therefor as business expenses. *W. M. Ritter Lumber Co., supra.*

The next issue to be considered is petitioner's claim for accelerated depreciation on its mining equipment in addition to that normally allowed.

Throughout the period here involved petitioner depreciated its items of equipment on the straight line basis. This method of depreciation assumes annual returns on the life of the asset. It contemplates the setting aside each year of a sufficient amount which, when added to the salvage value of the asset at the end of its useful life, will aggregate its original cost. Petitioner claimed and was allowed a deduction for a normal depreciation based upon this method. In addition to this, petitioner claimed on its income tax returns, for the years under review, additional depreciation of 100 per cent of such normal depreciation. At the hearing petitioner amended its position to claim additional depreciation in the percentages set out in the findings of fact in lieu of those amounts claimed on its returns.

The amount of accelerated depreciation now claimed is based directly upon the operating hours of petitioner's tipple. There was testimony to the effect that virtually all of petitioner's mechanized equipment was in use when its tipple was operating and that during each of the years 1939 and 1940, years which were considered to be normal, the tipple was operated on an average of 2,750 hours, respectively. Hence, petitioner reasons any operation of the tipple in excess of that number of hours shows a proportionately greater use of all its equipment and thereby warrants the claimed allowance for abnormal depreciation.

This Court has held in a number of cases that if a taxpayer normally employs the straight line method of computing depreciation, as here, evidence of increased usage and other operating conditions do not warrant an allowance for abnormal or accelerated depreciation absent a showing that the useful life of the depreciable asset was, in fact, thereby shortened. E. g., *Copifyer Lithograph Corporation*, 12 T. C. 728; *Harry Sherin*, 13 T. C. 221. Therefore, before petitioner can prevail herein it must justify the additional depreciation which it claims by showing not only that there was increased usage and other conditions tending to accelerate the exhaustion of its equipment but also that such factors did actually reduce the useful life of such equipment. *Woodside Cotton Mills*, 13 B. T. A. 266. Petitioner has failed to make this showing. It has shown in general terms that its mine was operated at an excessive pace and that proper maintenance for its equipment was not available. These two factors, however, do not prove that the remaining useful life of such equipment was necessarily shortened. To the contrary, there was no actual worthlessness or abandonment of the property, nor is there evidence that any such eventuality was likely. Assuming that there was an excessive amount of wear and tear, the indications were that this would be but temporary and petitioner so regarded it. We cannot appropriately find that the economic life of petitioner's equipment had been materially shortened or was in any danger of being exhausted. Such is necessary to sustain a claim for accelerated depreciation. See *Wier Long Leaf Lumber Co.*, 9 T. C. 990, reversed on other issues, 173 F. 2d 549. The only evidence in this respect consists of the categorical opinion of petitioner's president. This testimony was not substantiated and the qualifications of the witness to express an opinion on this subject were not satisfactorily demonstrated. It is not conclusive. *The Conqueror*, 166 U. S. 110.

In our opinion, the petitioner has not justified an allowance for depreciation during the taxable years in excess of that amount allowed by respondent. Accordingly, respondent's action will not be disturbed.

The fourth question concerns the propriety of the petitioner's claim to a deduction on its 1941 Federal income tax return for additional income taxes paid in that year to the Commonwealth of Virginia on its 1938 and 1939 income. Our findings show that certain adjustments were made by respondent in petitioner's 1938 and 1939 Federal tax returns from which resulted a deficiency. Thereupon the Commonwealth of Virginia made similar adjustments and asserted additional tax to be due it. Petitioner paid this additional tax to Virginia in 1941. Although it is on the accrual basis, it seeks, for Federal tax purposes, to deduct such payment from its 1941 gross income.

The rule is well established that for deduction purposes taxes accrue when all events have transpired which determine the amount of the

tax and the taxpayer's liability therefor. E. g., *United States* v. *Anderson*, 269 U. S. 422; *Standard Paving Co.*, 13 T. C. 425, 447; *Oregon Pulp & Paper Co.*, 47 B. T. A. 772, 780; *Haverty Furniture Co.*, 20 B. T. A. 644. Here all of the events had occurred prior to 1941 which fixed the amount and the liability to pay. Petitioner's erroneous report of its proper tax would not alter the correct amount of that tax nor petitioner's liability for it. The subsequent discovery and correction of the error related back to the taxable year in which the mistake occurred. *Haverty Furniture Co., supra.* Petitioner's lack of knowledge of the additional tax until 1941 is not controlling. Such was true in *Standard Paving Co., supra,* and *Oregon Pulp & Paper Co., supra.* In neither case did we allow a deduction for taxes paid which had accrued during an earlier tax period.

Petitioner seeks to discount and discredit our holding in *Standard Paving Co., supra.* Its argument is essentially the same as the one advanced by the petitioner in that case and its reasoning follows substantially that of the dissenting opinion in *Oregon Pulp & Paper Co., supra.* We are of the opinion that petitioner's argument and its underlying reasoning are incorrect. Accordingly, the determination of the respondent as to this issue is approved.

We turn now to the question of whether the refund of excess profits tax in the amount of $5,403.83 relating to 1940, scheduled in 1949, and the overassessment of such tax for 1941 in the amount of $13,-256.61 which was determined in 1947, should both be included in petitioner's accumulated earnings and profits throughout the years here involved. The answer to this question must be in the negative. The refund was scheduled and the overassessment determined under the provisions of section 722 of the Internal Revenue Code, pursuant to the agreements between the parties reached on or about June 8, 1948, and October 27, 1947, as to the years 1940 and 1941, respectively. In enacting this section, Congress has provided that the excess profits tax must be computed, returned, and paid without regard to any of the provisions of the section. Section 722 (d), Internal Revenue Code.[3] Relief is then obtained by way of a refund or credit after the

---

[3] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

\* \* \* \* \* \* \*

(d) APPLICATION FOR RELIEF UNDER THIS SECTION.—The taxpayer shall compute its tax, file its return, and pay the tax shown on its return under this subchapter without the application of this section, except as provided in section 710 (a) (5). The benefits of this section shall not be allowed unless the taxpayer within the period of time prescribed by section 322 and subject to the limitation as to amount of credit or refund prescribed in such section makes application therefor in accordance with regulations prescribed by the Commissioner with the approval of the Secretary. If a constructive average base period net income has been determined under the provisions of this section for any taxable year, the Commissioner may, by regulations approved by the Secretary, prescribe the extent to which the limitations prescribed by this subsection may be waived for the purpose of determining the tax under this subchapter for a subsequent taxable year.

taxpayer has filed an application showing that the excess profits tax thus computed results in an excessive or discriminatory tax. It must also have established what would be a fair and just amount representing normal earnings to be used in the constructive average base period net income in lieu of the taxpayer's actual average base period net income. Section 722 (a), Internal Revenue Code.[4] Here, the record indicates that the initial steps to establish its right to relief under the provisions of section 722 were taken by petitioner when it filed its application therefor on September 9, 1943. This application was subsequently amended on August 26, 1946. In so far as the application pertained to the year 1940, an agreement was executed on June 8, 1948, pursuant to which a refund was scheduled on February 25, 1949. Previously, on October 27, 1947, the agreement relating to the year 1941 had been executed, which resulted in the determination of an overassessment for that year. We hold that the refund granted and the overassessment determined as a result of these agreements did not accrue retroactively to petitioner as assets but rather became such assets on the dates the agreements were made.

The disputed funds (or the right to receive them) did not become subject to payment of petitioner's debts until the above agreement was reached. Until this time the Government owed no duty to petitioner to make the refund. To the contrary, from the dates that the original returns were filed until the dates of the agreements, petitioner had a positive obligation to the United States: A duty to pay the tax thus reported. The fact that the statute permitted the taxpayer subsequently to make application for and be granted relief therefrom in no way indicates that during the intervening period the taxpayer was relieved of the duty to pay this tax or was to derive any benefit from the amounts in controversy. *Manning* v. *Seeley Tube & Box Co.*, 338 U. S. 561. With reference to the year 1940, the abatement of the tax liability and the accrual of the refund asset did not take place until the date of the agreement, on or about June 8, 1948. Likewise, the overassessment in petitioner's 1941 excess profits tax, finally deter-

---

[4] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that, in the cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

mined by the agreement of October 27, 1947, did not accrue to petitioner's benefit until that date. Accordingly, petitioner is not entitled to have these overassessments included in its accumulated earnings and profits throughout the years here involved.

The situation presented in *Stern Brothers & Co.*, 16 T. C. 295, is not presented here. There it was held that income and excess profits taxes must be reflected in accumulated earnings carried over from the end of the year to which those taxes related. We said: "If accumulated earnings and profits at the start of any taxable year are to show the true financial status of an accrual basis taxpayer, an adjustment must be made for income and excess profits taxes arising in the preceding year." In other words, in *Stern* accumulated earnings were reduced in the year in which the excess profits tax arose. Here, however, the question concerns the propriety of increasing accumulated earnings by reason of later refunds of such taxes under section 722. In the *Stern* case, where we said that this was not the "* * * usual accrual for purposes of deduction from, or inclusion in, income" we referred to the usual accrual question as it involves the contested tax rule, that is, that a contested tax does not accrue until liability therefor is finally determined. We said that the contested tax rule could not apply there for the taxpayer could, by contesting its liability from income and excess profits taxes, postpone accrual of such taxes until the contest was settled; this with the result that its accumulated earnings would be excessive for purposes of computation of the invested capital credit. The character of the amounts involved in the instant case is quite different, however, since they arise out of *refunds* of excess profits taxes under section 722. These refunds are not accruable prior to their receipt for reasons explained above in our other discussion of this issue. Such refunds cannot, therefore, relate back so as to increase accumulated earnings for prior years. The issue involving post-war refunds under section 780 of the Code also present in the *Stern* case is not involved here either directly or by analogy. Refunds under section 780 are automatic in the sense that they are fixed in amount by statute, based on the excess profits tax paid and thus accruable. Refunds under section 722 are not automatic in nature and clearly unlike those provided for by section 780.

The final issue concerns deductions for certain items of interest to which petitioner contends that it is entitled. The interest involved is that which petitioner will be required to pay on the deficiencies that we have herein determined to be due.

As pointed out above, the rule of the *Anderson* case requires that in order for a tax to be accrued, all the events which fix the amount of that tax and the liability to pay it must have happened. This rule

is also applicable to the accrual of an item of interest. Thus for deduction purposes, interest on contested taxes accrues in the year in which the liability for such taxes is determined. *Lehigh Valley Railroad Co.*, 12 T. C. 977. The liability for the taxes herein contested becomes fixed only upon the conclusion of this proceeding and the interest thereon accrues simultaneously therewith. Accordingly, petitioner is not entitled to a deduction from income for any of the years here involved for interest accruing as a result hereof, and we so hold.

*Decision will be entered under Rule 50.*