ELEANOR M. LUTZ, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2718–64—2720–64. Filed March 31, 1966.

---

[1] Proceedings of the following petitioners are consolidated herewith: E. W. Lutz and Helene B. Lutz, docket No. 2719–64, and Philip B. Lutz and Shirley H. Lutz, docket No. 2720–64.

*Donald C. Dahlgren* and *W. Paul Uhlmann*, for the petitioners.
*Norman H. McNeil*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in income tax for the taxable years in question as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 2718–64 | Eleanor M. Lutz | 1960 | $29,320.01 |
| | | 1961 | 512.50 |
| | | 1962 | 33,106.07 |
| 2719–64 | E. W. Lutz and Helene B. Lutz | 1960 | 26,687.74 |
| | | 1961 | 628.16 |
| | | 1962 | 43,563.20 |
| 2720–64 | Philip B. Lutz and Shirley H. Lutz | 1960 | 25,202.97 |
| | | 1961 | 478.32 |
| | | 1962 | 30,942.31 |

Certain issues raised in the pleadings have been abandoned or settled by agreement between the parties. The two issues remaining for decision are:

(1) Whether certain liabilities for State of Washington retail sales tax were contingent, and therefore not properly accruable by the partnership, General Investment Co., during the taxable years in question.

(2) Whether petitioners, shareholders in the General Mortgage Agency, Inc., which elected to be taxed under subchapter S, are entitled to amortize the cost of covenants not to compete acquired by the corporation in connection with the purchase of four insurance agencies.

### GENERAL FINDINGS OF FACT

The stipulated facts are found as stipulated.

Petitioner Eleanor M. Lutz resides in La Jolla, Calif., and filed her individual Federal income tax returns on a calendar year basis for the taxable years in question with the district director of internal revenue, Los Angeles, Calif.

Petitioners E. W. Lutz and Helene B. Lutz are husband and wife, as are petitioners Philip B. Lutz and Shirley H. Lutz, all residing in Longview, Wash. They filed joint Federal income tax returns on a calendar year basis for the taxable years in question with the district director of internal revenue, Tacoma, Wash.

*Issue 1. Deductibility of Washington Retail Sales Tax*

### FINDINGS OF FACT

Petitioners are members of a family partnership known as the General Investment Co. of Longview, Wash. (hereinafter referred to as

the partnership), the principal business activity of which was the construction of military and residential housing during the taxable years in question.

The partnership kept its books on the accrual basis of accounting and filed its Federal partnership returns (Form 1065) on a fiscal year basis for the fiscal years ended January 31, 1960, 1961, and 1962, with the district director of internal revenue, Tacoma, Wash.

On August 21, 1958, the partnership was awarded the first of two contracts for construction of military housing units at Larson Air Force Base, Moses Lake, Wash. These contracts were awarded pursuant to the provisions of the Capehart Act of 1955 (Housing Amendments of 1955, tit. IV, sec. 403, 69 Stat. 635, 651, 42 U.S.C. sec. 1594) and are sometimes referred to herein as the Capehart contracts. The first contract provided for construction of 200 housing units and was completed by the partnership in its fiscal year ended January 31, 1960. The second contract was awarded May 10, 1960, and provided for construction of an additional 330 units. This second contract was completed during the partnership's taxable year ended January 31, 1962. For Federal income tax purposes the partnership reported its profit or loss from the construction contracts under the Capehart Act on the completed contract basis. Proceeds received under the first contract were reported as gross income or sales for the partnership's fiscal year ended January 31, 1960, and proceeds received under the second contract were reported as gross income or sales for the partnership's fiscal year ended January 31, 1962. The partnership also reported costs incurred in the completion of these construction contracts in the years in which gross income was reported, and included as expenses were deductions for State of Washington retail sales tax on the first contract in the amount of $113,943.46, for the fiscal year ended January 31, 1960, and in the amount of $215,465.96 on the second contract for the fiscal year ended January 31, 1962. Their proportionate share of the net profit or loss of the partnership on these contracts was reported on the income tax returns of petitioners for the calendar years ended December 31, 1960 and 1962.

Pursuant to the Capehart Act, the Secretary of Defense is authorized to contract with a builder to construct a military housing project on land leased from the Federal Government. The builder organizes a corporation to carry out the project and the corporation is granted a lease to the land by the Government. The corporation may obtain funds with which to finance construction by mortgaging its leasehold interest, and the mortgage is eligible for FHA insurance. When construction is completed, responsibility for operation and maintenance of the housing project is transferred to the Secretary of Defense and all the stock of the corporation is also transferred to the Secretary of

Defense, although the corporation remains in existence and continues to be the mortgagor.

Although the construction contract is let to a corporation formed by the contractor, because of the close participation of the U.S. Government, a question arose as to the applicability of the Washington State retail sales tax to proceeds received under Capehart Act contracts.

There were several contractors other than the partnership which were engaged in Capehart Act projects in the State of Washington prior to and at the time the partnership was awarded its first Capehart contract in August 1958. Certain of these contractors took the position that proceeds received under these contracts were not subject to the Washington State retail sales tax because the sale was made to the United States, and therefore the proceeds were exempt from the tax. In the fall of 1957 one of the contractors involved submitted the question of applicability of the sales tax to Capehart contracts to the Tax Commission of the State of Washington for determination.

The office of the attorney general for the State of Washington in an unpublished memorandum dated December 24, 1957, advised the State Tax Commission that in its opinion the State retail sales tax applied to the Capehart contracts. The attorney general concluded that the transaction involved was one between a private builder and a private corporation, that the financing corporation was a "consumer" under State law, and that the State retail sales tax attaches to a charge for construction performed for a consumer.

Based on this opinion of the State attorney general and a subsequent opinion received from the State attorney general in April 1959, the State Tax Commission determined that the retail sales tax applied to Capehart contracts. Due to an expected court contest challenging the applicability of the retail sales tax to these contracts, the State Tax Commission decided to hold collection of the tax in abeyance pending final determination of the question. Subsequently in the spring of 1960 four of the Capehart contractors filed suits in the Superior Court of the State of Washington for Thurston County, contesting the applicability of the State retail sales tax on constitutional grounds, and asking that the State Tax Commission be permanently enjoined from collecting the retail sales tax on the proceeds of these contracts. The partnership considered joining the other contractors in litigating the tax but on the advice of its attorneys decided not to do so. The partnership was not a party litigant in these or any other court proceedings contesting the applicability of this tax, and did not contribute to the costs of the litigation conducted by the other contractors.

Specifications published in connection with submission of bids on Capehart contracts provided that if there were any State sales taxes applicable to the contract price they would be the obligations of the bidder. The partnership computed the estimated retail sales tax and

included this amount as an expense item in the preparation and submission of its bid for the two Capehart contracts received.

After receipt of the first contract in August 1958 and prior to filing its initial State excise tax return covering the first Capehart contract, the partnership requested authority from the State of Washington to withhold payment of the retail sales tax on the proceeds from this contract. The attorney general of the State of Washington granted such authority in a letter dated September 30, 1958. That letter provided in part as follows:

This will serve as notice that it will not be necessary * * * to report or remit any sales tax which may be due with respect to the above construction [Capehart Act construction at Larson Air Force Base] until such time as the Tax Commission shall notify you that such tax is payable. All penalties and interest will be waived until the Commission has reached its determination.

Although payment of the sales tax had been deferred, the State of Washington required Capehart contractors to file returns and report sales, and as work progressed on the first contract, during 1958 and 1959, the partnership filed excise tax returns with the State of Washington on a bimonthly and quarterly basis. The returns covered both the business and occupation tax and the retail sales tax, and as application of the business and occupation tax was not subject to dispute the partnership computed and paid the full amount of the business and occupation tax due on the gross income received under the Capehart contract during the period covered by the return. The partnership also reported these amounts as receipts for retail sales tax purposes but claimed a deduction in the same amount, resulting in no retail sales tax being reported as due on the proceeds of this contract. The deduction of the sales was itemized as "Sales to U.S. Government." The excise tax returns filed by the partnership reported total sales of $3,077,090.43 for the first Capehart contract.

As work progressed on the second contract, during 1960 and 1961, the partnership filed Washington State excise returns on a regular basis. The manner of reporting income subject to the retail sales tax for the second Capehart contract was identical to that utilized under the first contract; total sales for the period were reported and a deduction was made for the total amount of sales reported, and this deduction was itemized as "Sales to U.S. Government." The returns filed by the partnership on its second contract reported total income of $5,386,648.94. These excise tax returns were filed by the partnership, and the other Capehart contractors, in this manner pursuant to agreement with the State Tax Commission. This permitted the tax commissioner to audit the amounts reported by the contractors and issue assessments showing the amount of tax due.

On May 11, 1960, after the four contractors had filed suit, the State Tax Commission issued a general administrative ruling announcing

that the collection of retail sales tax on those four Capehart construction contracts, and any similar Capehart contracts, would be held in abeyance pending judicial determination of the pending cases. This action by the State Tax Commission was taken pursuant to the provisions of the Washington Revised Code, sec. 82.32.190. In addition to placing collection of the tax in abeyance, the ruling ordered that no interest or penalties would be collected in respect to the taxes so placed in abeyance, provided that in the event the commission should prevail in the pending litigation, the tax liability in question was paid in full in 90 days after final determination of the litigation. In arriving at this decision officials of the State Tax Commission were influenced by several factors including the fact that large sums of money were involved, that if collections were made and a refund later required there might be an extensive impact on the general funds of the State, and that issuance of a refund would require payment of interest to the taxpayer.

Despite issuance of the ruling of May 11, 1960, holding collection of the tax in abeyance, the Tax Commission continued to issue assessments to Capehart contractors, but on a deferred payment basis. The purpose of these assessments was to establish the correct amount of tax which was being held in abeyance. The State tax commissioner considered that liability for the retail sales tax arises at the time of sale, and the amount of the tax is held in trust by the taxpayer for the State of Washington.

On August 29, 1960, the State Tax Commission issued an assessment against the partnership for retail sales taxes due on the first Capehart contract in the amount of $119,600.64,[2] plus interest in the amount of $4,408.48. The tax commissioner's letter of transmittal to the partnership stated in part as follows:

The state's ability to tax income derived under this Act is presently being attacked in the courts and until the matter is decided the state has been enjoined from collecting the taxes in dispute. We therefore have issued this assessment on a deferred basis pending the outcome of the litigation. At this time no request for payment of the tax is being made, the assessment has been prepared merely to complete our records.[3]

Subsequently, on August 16, 1961, this original assessment on the first contract was canceled and replaced by a new assessment for sales tax of $119,600.64 and interest of $3,806.47. The audit interest of $3,806.47 was later deleted from the assessment and only the retail sales tax due in the amount of $119,600.64 was ultimately paid by the partnership in a subsequent taxable year.

During the period from May 11, 1960, when the Tax Commission issued its general abeyance order, to March 14, 1961, some of the Capehart contractors completed their projects and instituted pro-

---

[2] The partnership originally computed the amount of tax as $113,943.46.

[3] It seems doubtful that an injunction was ever actually issued against the State.

ceedings through the secretary of state of the State of Washington for voluntary dissolution of their corporations, a procedure which requires clearance by the State Tax Commission before dissolution can be completed. Due in part to findings resulting from investigations made in connection with corporations petitioning for dissolution the State Tax Commission determined that it would be in the best interest of the State if the previous general abeyance order was revoked with further abeyance orders to be granted only on an individual basis. The Tax Commission preferred to continue holding collection of the tax in abeyance for those contractors who could satisfy the Tax Commission that their financial position would permit such a procedure.

On March 14, 1961, the Tax Commission revoked its general abeyance ruling of May 11, 1960, and stated that it would continue to hold collection of the tax in abeyance only in those cases where it could ascertain that further deferment would not place collection of the tax in jeopardy. This later ruling further provided that abeyance orders would be granted only upon receiving petitions from individual taxpayers. Pursuant to such ruling, on March 21, 1961, the partnership filed a petition requesting in writing that the Tax Commission hold collection of the retail sales tax on its first contract in abeyance pending the outcome of the existing litigation.

The State Tax Commission replied to this request on April 5, 1961, and indicated that continued abeyance and collection of the taxes due on the first contract would be considered only if adequate bond was posted. On April 17, 1961, the partnership proffered a form of personal bond to the State Tax Commission in the face amount of 1½ times the amount of retail sales tax due on the first contract, which was signed by the partnership.[4] This bond was subsequently accepted by the State Tax Commission by letter dated June 29, 1961, and the State Tax Commission agreed to continue holding in abeyance collection of the retail sales tax due on the first contract of the partnership, contingent upon a satisfactory financial analysis of each of the individual sureties on the bond. This bond was later accepted unconditionally by the State Tax Commission.

On August 16, 1961, the State Tax Commission issued a supplemental assessment against the partnership for retail sales tax due on its first Capehart contract in the amount of $1,238.19, together with interest in the amount of $139.69. The audit interest of $139.69 was later eliminated and the retail sales tax due in the amount of $1,238.19 was ultimately paid by the partnership in a subsequent taxable year.

On October 18, 1961, after the partnership had completed its second Capehart contract, the State Tax Commission issued an assess-

---

[4] Petitioners E. W. Lutz, Helene B. Lutz, P. B. Lutz, and Shirley H. Lutz also signed individually as sureties.

ment for retail sales tax due on the second contract in the amount of $215,465.96. The partnership filed a petition similar to that filed with respect to the first contract requesting the State Tax Commission to hold collection of the assessment in abeyance pending outcome of the litigation. The bond filed by petitioners was accepted by the State Tax Commission by letter dated December 15, 1961, and it agreed to place collection of the retail sales tax on the second contract in abeyance pending outcome of the litigation.

The State of Washington prevailed in proceedings before the trial court in a decision rendered in the Superior Court of the State of Washington for Thurston County on July 3, 1961, and the Capehart contractors who were parties to the litigation appealed this decision to the Supreme Court of the State of Washington. The decision of the trial court was later affirmed by the State Supreme Court on August 1, 1963, in an opinion reported as *Murray* v. *State*, 62 Wash. 2d 619, 384 P.2d 337 (1963). Thereafter the Capehart contractors who were parties to the action filed petition for writ of certiorari to the Supreme Court of the United States.

On August 20, 1963, after the decision of the State Supreme Court, one of the partners and the attorney for the partnership visited the office of the secretary of the State Tax Commission in Olympia, Wash. The purpose of this meeting was to offer payment of the taxes in full on behalf of the partnership. The partnership had adequate liquid funds on hand with which to pay the taxes and desired to avoid imposition of interest on the amounts then due. Despite this offer of payment it was still the position of the State Tax Commission, for the reasons previously advanced, that collection of the tax should remain in abeyance until such time as the pending litigation was finally settled. As a result of this meeting a letter was sent from the office of the State Tax Commission to the attorney for the partnership, dated September 26, 1963, which stated in part as follows:

The courts of the State of Washington have upheld the right of the State of Washington to collect taxes of a similar nature against other Capehart contractors similarly situated. General Investment Co. has not and is not now prosecuting any action or taking any other steps to contest the tax. However, in order to eliminate the imposition of interest or penalty on the tax liability, General Investment Co. provided for payment of said tax liability in accordance with the requirements of the Tax Commission.

This letter will confirm our understanding and agreement that neither interest nor penalty will be charged on either of said tax assessments until the litigation now pending, which is being prosecuted by persons other than General Investment Co. has been finally concluded or unless otherwise ordered by this Commission.

On June 22, 1964, the petition of the litigating contractors for writ of certiorari to the Supreme Court of the United States was denied for lack of a substantial Federal question. (*Inland Empire Builders*,

*Inc.* v. *Washington*, 378 U.S. 580 (1964).) Shortly thereafter the State Tax Commission requested payment of the retail sales tax due on the two Capehart contracts performed by the partnership, and full payment of the amounts previously assessed by the Tax Commission was promptly made by the partnership on July 29, 1964. The Tax Commission waived all interest and penalties in accepting final payments of the assessment issued.

During the period commencing with its first Capehart contract in August 1958 and continuing through the end of the second contract in June 1961, the partnership accrued liability for the retail sales taxes on its partnership books. However, the trial balances and profit and loss statements for these two projects prepared for the partnership in the field listed the amounts of sales tax due (as computed by the partnership) as expense items or liabilities under the caption "Sales Tax (in dispute)" and these were carried over onto the ledger accounts and the balance sheets in the same manner. According to petitioner E. W. Lutz these entries were made in this manner to explain why the liability was still carried on the books when the partnership had adequate cash and liquid assets on hand with which to pay the tax.

On the balance sheet attached to the partnership information return (Form 1065) filed for the fiscal year ended January 31, 1960, the sum of $113,943.46 was shown as a liability, with a footnote explaining that it represented sales tax claimed by the State in connection with a Government Capehart construction project which taxpayer is contesting. When this return was prepared, the partnership was considering whether it should join in the litigation which was about to be commenced by the other Capehart contractors, and the notation was inserted to explain why this liability was unpaid when it appeared that the partnership had adequate liquid resources to pay it. However, after consulting with its attorney, the partnership decided not to join with the other contractors in the suit. The attorney advised that if the partnership ever wanted to contest application of the tax, there would be other alternatives available, including filing a protest with the State Tax Commission against assessments if they were issued, or paying the tax and filing suit for refund. However, the partnership did not take any steps under either of these alternatives to contest the tax.

On its partnership information return (Form 1065) filed for the fiscal year ended January 31, 1961, the balance sheet listed as a liability the sum of $113,943.46. A notation was added on the final page of the return indicating that this amount was "Reserve for State Sales Tax on Government Capehart Housing Contract which is being contested in Court and which the State has been enjoined from collecting."

Similar entries were made in the partnership records and books with respect to the sales tax due on the second Capehart contract, in the

amount of $215,465.96. However, on the information return (Form 1065) filed by the partnership for the fiscal year ended January 31, 1962, the amount of $215,465.96 was deducted for State sales tax as a part of the cost of goods sold, with no notation, and the balance sheet simply listed a liability for accounts payable in the amount of $356,963.96, which included the retail sales tax due the State on both Capehart contracts. There was no indication on the return that these amounts were in dispute.

At no time did the partnership or any of its individual partners file any protest with the State Tax Commission concerning the amount or applicability of the retail sales taxes due on the Capehart contracts. At no time did the partnership or any of its individual partners institute court proceedings, contesting either the amount or liability for the tax. Neither the partnership nor any of its individual partners ever contributed financially to any action being prosecuted by third parties contesting applicability of the tax. The partnership at all times had sufficient liquid assets available to pay the tax if it was demanded by the State.

OPINION

This first issue is whether petitioners are entitled to accrue and deduct on their Federal income tax returns for 1960 and 1962 the State of Washington retail sales taxes ultimately determined to be due on the Capehart Act contracts completed by their partnership in its fiscal years ending in 1960 and 1962. As set out in more detail in the above Findings of Fact, the partnership computed its income on the accrual method of accounting and reported it for Federal income tax purposes on the completed contract basis. The applicability of the State retail sales tax here involved to Capehart contractors was contested and litigated through the courts by four of the Capehart contractors operating in Washington during the years involved, which litigation finally terminated in favor of the State in 1964. While the partnership did not participate in the litigation, arrangements were made with the State tax commissioner whereby the partnership reported the income it received under its two contracts on its State sales tax returns and claimed a deduction of the same amount, resulting in no tax being paid to the State on this income. The State tax commissioner computed the tax due on the gross income reported and assessed the tax but agreed not to collect it until the litigation conducted by the other contractors was terminated. Although the partnership did not pay the State tax at the time it filed its State tax returns, it did accrue the liability therefor on its books for the years involved and deducted the amount thereof in computing its income for Federal income tax purposes for those years. Petitioner paid all of the tax here involved to the State Tax Commission in 1964 after termination of the litigation.

Respondent takes the position that the State tax was being contested and was contingent during the years involved and hence was not properly accruable or deductible until the litigation was terminated and the tax was paid in 1964. Petitioners claim that the partnership was not contesting the tax at any time and that it was properly accruable in the years for which it was due.

The parties agree that the use of the accrual method of keeping books does not preclude the use of the completed contract method of reporting income. See *R. G. Bent Co.*, 26 B.T.A. 1369; *A. D. Irwin*, 24 T.C. 722. In the *Irwin* case this Court said:

Such [completed contract] method of accounting contemplates proper accrual of all unpaid billings, accounts receivable, and accounts payable in the year the contract is substantially completed * * *. [Cits. omitted.] The only exception to the rule requiring the accrual of outstanding items in the year of completion is made in the case of outstanding items which are "contingent and uncertain." * * * We must therefore determine whether the items in question came within this exception.

The same reasoning is applied in determining whether items of expense are deductible within a taxable year under the accrual method of tax accounting and the case law relevant to accrual accounting should be equally pertinent to the completed contract basis of tax accounting, although we must confess it would seem that the basic concept of the accrual method of accounting, which is to match expense items against the income items they help to produce, is particularly apropos to the completed contract basis for computing income. But see *Security Mills Co.* v. *Commissioner, infra.*

The basic ground rules for determining whether an expense item is accruable and deductible in a particular year have been established for many years and are not really in dispute. It is only when we attempt to apply those basic rules, and the refinements thereof, to particular factual situations that a divergence of opinion occurs. But despite, or perhaps because of, the many factual situations which have been exposed to the application of these ground rules, we have been unable to find a case which points unerringly to the correct answer in this case.

In *United States* v. *Anderson*, 269 U.S. 422, the Supreme Court recognized that under the accrual method of accounting in order to properly reflect income, all income and expenses properly accruable in a taxable year must be taken into consideration in computing taxable income for that year. The fact that a tax on the income for that year was not due and payable until the following year did not prevent its accrual in the earlier year where all the events had occurred in the earlier year which fixed the amount of the tax and determined the liability of the taxpayer to pay it. But in *Dixie Pine Co.* v. *Commissioner*, 320 U.S. 516, the Supreme Court also held that where a liability was being contested by the taxpayer and was contingent the "all events" test had not been met in the taxable year to fix the amount and

the fact of the taxpayer's liability for items of indebtedness deducted though not paid. Under such circumstances the Court held the deduction for a State tax must await the event of the State court litigation and be claimed in the year in which the taxpayer's liability for the tax was finally adjudicated.

In *Security Mills Co.* v. *Commissioner*, 321 U.S. 281, the Court held that the legal accounting principle that deductions shall be taken for the taxable year in which "paid or accrued" does not permit taking a deduction for a contingent liability prior to the date it actually accrues; and that a taxpayer may not accrue an expense the amount of which is unsettled or the liability for which is contingent, and that that principle is fully applicable to a tax the liability for which the taxpayer denies and the payment whereof he is contesting. The Court held that the exception to the general rule contained in that clause of section 43 of the Revenue Act of 1934 which read "unless in order to clearly reflect the income the deductions or credits should be taken as of a different period" did not permit substitution of a hybrid method of accounting for the annual system of accounting long used in the taxing statutes.

One of the refinements to the basic rules established by the above cases and adopted by the Commissioner's regulations, see sec. 1.461-1 (a) (2), Income Tax Regs., is the question of when the taxpayer is "contesting" the expense item, such as a tax; and much litigation has involved this issue with some disagreements among the courts. The Court of Claims has rather consistently adhered to the principle that for a contest to exist which would prevent the deduction of an item otherwise accruable, the taxpayer himself must participate in the litigation, see *Pittsburgh Hotels Co.* v. *United States*, 63 Ct. Cl. 475 (1927), or must at least have evidenced his disagreement over his liability for the tax or the amount thereof by some objective act, such as lodging a formal protest with the taxing authorities or instituting suit in a court of law, and that the concept of "contest" will not be extended to depend on the taxpayer's subjective motive when the return was filed. See *Dravo Corporation* v. *United States*, 348 F. 2d 542 (Ct. Cl. 1965).

This Court distinguished the *Pittsburgh Hotels Co.* case in *Lepman Bros. Co.*, 45 B.T.A. 793 (1941), on the grounds that in the *Pittsburgh* case the taxpayers had never protested the tax or been a party to the litigation, whereas in *Lepman* the taxpayers had joined in the litigation originally but had failed to appeal because the trial court had ordered that the ultimate liability of all the taxpayers would be determined by the outcome of an appeal by any of them. However, this Court has gone further to recognize that a "contest" exists, so as to prevent the accrual of taxes, not only where the taxpayer contests the

amount of the tax liability, although not the fact thereof, in the courts, see *Lehigh Valley Railroad Co.*, 12 T.C. 977 (1949), but also where the taxpayer does not accrue the liability on its books and denies liability therefor by filing returns under protest, see *Great Island Holding Corporation*, 5 T.C. 150 (1945), or knowingly omits income from or claims a deduction on his State tax return which reduces the amount of that tax, see *Gunderson Bros. Engineering Corp.*, 16 T.C. 118 (1951), even though he later agrees to the additional tax and pays it without protest, see *Agency of Canadian Car & Foundry Co.*, 39 T.C. 15 (1962). But cf. *H. E. Harman Coal Corporation*, 16 T.C. 787 (1951), modified on other grounds 200 F. 2d 415; *Gulf States Utilities Co.*, 16 T.C. 1381 (1951); *Denise Coal Co.*, 29 T.C. 528 (1957); *Colt's Manufacturing Co.*, 35 T.C. 78 (1960).

In *Southwest Exploration Company* v. *Riddell*, 232 F. Supp. 13 (1964), the U.S. District Court for the Southern District of California reviews the above and other cases and concludes, among other things, that by merely submitting a return showing that a certain tax is due the taxpayer asserts that no more than that is due, and if the assertion is made knowingly and in good faith, there is a "contest" as to any amount over that which is shown on his return. "Thus, until the taxpayer accedes to the assessment of a greater amount, he is contesting that amount, and cannot accrue it," citing *Agency of Canadian Car & Foundry Co.*, *supra*, and *Gunderson Bros. Engineering Corp.*, *supra*. "In short, any time there is a good faith dispute as to the law or as to proper evaluation of the facts which determine the taxpayer's tax liability there is a contest," citing Rev. Rul. 57–105, 1957–1 C.B. 193.

Another issue that has arisen under the "contest" concept is the effect of payment of the item involved. Compare *Chestnut Securities Co.* v. *United States*, 62 F. Supp. 574 (Ct. Cl. 1945); *Consolidated Edison Co. of New York* v. *United States*, 135 F. Supp. 881 (Ct. Cl. 1955), wherein the Court of Claims held that payment of the contested tax accrued it, with *United States* v. *Consolidated Edison Co.*, 366 U.S. 380 (1961), wherein the Supreme Court held that payment of the tax does not necessarily accrue it, and when the exact nature of the payment is not immediately ascertainable because it depends on some future event, such as the outcome of litigation, its treatment for income tax purposes must await that event. Congress has, however, settled this difference of opinion by providing in section 223(a)(1) of the Revenue Act of 1964 (sec. 461(f), I.R.C. 1954) that a taxpayer may deduct in the year of payment an amount transferred to provide for payment of an asserted liability which he is contesting. This provision, although retroactive, is of no benefit to petitioners here however, because the partnership did not pay the asserted tax in the years here involved. See sec. 1.461–2(c), Income Tax Regs.

Resort to the above cases to answer the problem before us gives little satisfaction because not only is there a disparity in the philosophies adopted by the courts but also none of those cases involved all of the pertinent factors we have here. The partnership here did not actually join in the litigation contesting the State tax nor did it file a formal protest with the State tax commissioner denying liability for the tax. On the other hand, it requested and was granted permission to withhold payment of the tax until the outcome of the litigation. It accrued the liability for the tax on its books and deducted the amount thereof on its Federal income tax returns (although in each instance it overtly indicated that the tax was in dispute, by someone at least), but at the same time deducted the amounts thereof on its State retail sales tax returns, thereby reflecting that it considered there was no tax due. Petitioners claim that the partnership would have paid the tax at any time the taxing authorities demanded it; but the fact remains that the partnership did not pay the tax nor provide for its payment during the years here involved in such a manner as to concede that it owed the tax.

Whether the partnership's actions brought the situation within the "contest" concept so as to deny accrual would be difficult to answer, but we do not think that question need be answered because we believe the more basic "all events" test requires denial of the deduction in the years 1960 and 1962. This test requires that to be deductible in a taxable year all the events must have occurred within that year which determines the fact of the taxpayer's liability for the tax. We do not believe this is limited to an inquiry into whether the contracts had been substantially completed, but is also dependent upon the legal question of whether the income from the contracts is subject to the tax. Absent the partnership's concession that the tax was applicable to its income from the Capehart contracts, this legal question could not be answered until the termination of the litigation which was instituted for the very purpose of determining whether the tax was applicable, not only to the income of the litigating contractors but to the income of all the Capehart contractors, including the partnership. We think there was a good-faith dispute between the State taxing authorities and all the Capehart contractors as to whether a tax was due on the proceeds of these contracts. It would be closing our eyes to realities to believe that the partnership would have conceded that it was liable for the tax until the litigation was terminated. Unless the partnership was disputing its liability for the tax, it could have at any time paid the tax and waived any right to recover the same, regardless of the outcome of the litigation, and we have little doubt the State taxing authorities would have accepted such payment. We can only

believe that it was because petitioners were not willing to concede liability for the tax that they were willing to file requests for abeyance of the tax and post personal liability bonds to secure payment of the tax in the event the contractors were unsuccessful in their litigation. Perhaps petitioners were willing to throw in the towel and pay the tax in 1963 after the Supreme Court of Washington had held the tax was due, but neither did they do so nor would payment at that time have accrued the tax in the years 1960 and 1962, which are before us.

So whether we consider the partnership a de facto contestant or a noncontestant, we cannot agree that all events had occurred within the taxable years here involved which would permit the partnership to properly accrue and deduct the State retail sales tax within those years.

We rather reluctantly hold for respondent on this issue.

### *Issue 2. Amortization of Covenants Not to Compete*

#### FINDINGS OF FACT

Petitioners during the taxable years in question owned a 50-percent stock interest in General Mortgage Agency, Inc., of Longview, Wash. (hereinafter referred to as Mortgage). The principal business activity of Mortgage is that of an insurance agency. The remaining 50 percent of the Mortgage stock during the years in question was owned by Robert V. Holmes, who first became associated with petitioners in the insurance business on July 1, 1958. Prior to association with Holmes, petitioners had been in the insurance business together since 1946. Petitioner E. W. Lutz is a licensed insurance broker with approximately 50 years' experience.

The shareholders of Mortgage filed an election to be taxed under subchapter S of the Internal Revenue Code of 1954 and Mortgage filed its U.S. Small Business Corporation Return of Income (Form 1120–S) on a fiscal year basis for the years ended January 31, 1960, 1961, and 1962 with the district director of internal revenue, Tacoma, Wash.

During these periods Mortgage claimed deductions for amortization of the costs of covenants not to compete acquired in connection with the acquisition of four insurance agencies, which deductions have been disallowed by respondent upon a determination that the value of the covenants not to compete was nonseverable from the acquisition of other intangible assets.

With respect to the four contracts which contained the covenants not to compete, hereinafter referred to as the Brownlee, Bevington,

Bingham, and McFadgen contracts, Mortgage made the following allocation of the purchase price:

| Contract | Allocation | | | |
|---|---|---|---|---|
| | Cost | Covenant | Property | Intangibles |
| Bevington | $2,627.44 | $2,127.44 | None | [1] $500 |
| Bingham | 8,913.33 | 8,913.33 | None | None |
| McFadgen | 21,300.00 | 21,000.00 | $300 | None |
| Brownlee | 10,000.00 | 6,500.00 | 3,500 | None |

[1] The amortization originally claimed on the Bevington contract was erroneously based upon the entire contract consideration but petitioners agree that $500 of the consideration is not allocable to the covenant not to compete.

Insurance agencies located in the region served by petitioners were small in size and normally were operated by one man as an adjunct to a real estate business. Business was basically founded on personal services and accounts were acquired through the friendship and associations of the agent. However, prior to and during the years in question, changes occurred in the insurance business which made it difficult for the small agent to compete with large companies. Some of the larger companies instituted the practice of underwriting policies directly; and in addition policies were often more specialized and demanded a higher degree of knowledge and skill on the part of the agent. Mortgage recognized that if it was to stay in the insurance business, it needed a more experienced man to operate the insurance department, and also the volume of the insurance business would have to be increased. Holmes, an experienced insurance man with an agency in Castle Rock, Wash., agreed to join with petitioners and he exchanged his interest in the Castle Rock agency for a 50-percent interest in Mortgage. The Castle Rock agency contributed by Holmes was comprised of the Brownlee agency and the Petersen agency, which agencies had previously been acquired by Holmes. Subsequently, Mortgage acquired seven other small agencies in the surrounding areas.[5]

The board of directors of Mortgage, consisting of E. W. Lutz, Philip B. Lutz, and Holmes, decided Mortgage would expand on a selective basis and would purchase the business or accounts of competing agents. The board also decided that Mortgage would pay an agent only for purposes of eliminating him from competition and would pay nothing for goodwill, because it was felt there was not sufficient goodwill connected with the operation of an agency to justify large expenditures for this purpose. It was decided that it was essential to secure a covenant not to compete from each seller, the cost of which could be amortized over the life of the covenant not to

[5] Respondent originally disallowed deductions for amortization of the cost of the covenants not to compete under all nine agency contracts but has now conceded that the deductions are allowable with respect to the other five contracts.

compete for tax purposes. Mortgage carefully considered the tax aspects involved in acquiring agencies, discussed them with their tax advisers, and negotiated for the businesses with these considerations in mind. The board, acting upon advice of legal counsel, insisted that a liquidated damages provision be included in the contracts so that the covenants not to compete could be enforced if necessary. There was no established policy used in determining the purchase price for the various agencies acquired and the amount offered varied according to the type and volume of business. However, an upper limit of 1½ times the total annual commissions was usually adhered to, and Mortgage would not pay more than that regardless of how attractive the business may have been. In most instances the purchase price was paid in cash and in some cases payments were made in installments, in which latter event payments were contingent upon the seller honoring his covenant not to compete.

Mortgage did not acquire or use the name of the agency purchased nor was any attempt made to use the previous location occupied by the agency. The business acquired was immediately transferred to the existing office of Mortgage and business was continued under Mortgage's name. Letters were sent by the seller to his customers thanking them for their business and notifying them of the sale. In most cases the sellers continued to conduct their real estate business at the same location and under the same name they had previously used.

The four contracts in question all provided a specific allocation of the purchase price to the covenant not to compete. The covenants, although differing in form, were substantially the same in all four contracts. The covenants provided generally that the seller agrees to refrain from engaging in any insurance business of any type within the surrounding area for a period of 5 years. Two of the contracts specifically stated that the purchaser desired to eliminate competition and was willing to pay a reasonable sum to the seller for an agreement not to compete; and three of the contracts also provided for liquidated damages in the event the covenant not to compete was breached by the seller.

Holmes had acquired the Brownlee insurance agency on August 17, 1957, for $10,000 by a written agreement of sale which stated that the value of various items of office equipment was $3,500, and contained a covenant not to compete which was valued at $6,500. Mortgage claimed a basis for amortization of the covenant not to compete in the amount of $4,550.03 on its return for the taxable year ended January 31, 1960.

The Bevington contract specifically allocated $500 of the $2,627.44 purchase price to the seller's expiration lists and records at the insistence of the seller, the balance of the purchase price being specifically

stated to be consideration for the elimination of the seller from competition for 5 years.

Robert W. Bingham operated a real estate loan and insurance business in Vancouver, Wash., as a sole proprietorship. His business reached a point where he was either going to have to hire someone to help him or dispose of one of the businesses. He decided to sell the insurance business and got in contact with Holmes, who arranged for the purchase of the business by Mortgage. The agreement of sale recited that the seller desired to dispose of his insurance business and retire from the operation thereof, and that the purchaser desired to eliminate competition and was willing to take over seller's insurance business and pay a reasonable sum to seller for a covenant not to compete for 5 years. The entire purchase price of $8,913.33 was specifically allocated to the covenant not to compete. Although he was aware of the tax implications of a covenant not to compete, Bingham did not consider that the covenant in the contract meant anything and he reported his gain on the sale as capital gain on his tax return.

Lyle H. McFadgen had been associated with Bruce E. Rodman in the real estate and insurance business in Longview, Wash., under the corporate name "Longview Agency, Inc." McFadgen operated the insurance business and Rodman the real estate business. In February 1960 McFadgen suffered a stroke which left him partially paralyzed and he began thinking of selling the insurance business. An agreement was reached for sale of the insurance business to Mortgage. As a part of this transaction McFadgen transferred his interest in the real estate business to Rodman and the insurance business was transferred to McFadgen in partial liquidation of the corporation. In this transaction Rodman gave McFadgen a written covenant not to compete in the insurance business, although no consideration was assigned to it. This covenant was transferable. In the agreement for sale of the insurance business by McFadgen to Mortgage, Rodman's covenant not to compete was assigned to Mortgage and McFadgen also gave a covenant not to compete for 5 years. Of the $21,300 purchase price, $300 was specifically allocated to certain furniture and equipment, and $21,000 was given as consideration for the covenant not to compete. Mortgage also agreed to employ McFadgen for 36 months at a salary of $500 per month, subject to his ability to serve Mortgage with approximately the same degree of efficiency he had served Longview Agency, Inc. Liquidated damages of $10,000 were provided for a breach of the covenant not to compete. McFadgen was highly respected in the community and when he moved over to Mortgage's offices his name and the name "Longview Insurance Agency" were placed on the window of the corporation's offices. Although McFadgen was aware of the covenant clause he attached little significance to it in view of his employment contract.

There was no indication of excessive or abnormal profits being made by any of the agencies at the times they were acquired by Mortgage. As a whole the acquisition of these agencies has not proved to be a good investment for Mortgage. Mortgage was unable to hold a good many of the accounts previously held by the agencies acquired. Holmes withdrew from Mortgage in 1962 and petitioners insisted that he take back and dispose of the Castle Rock business.

ULTIMATE FINDING

The amounts here involved were payments for covenants not to compete.

OPINION

The second issue is whether Mortgage could properly amortize a portion of the purchase price of certain insurance agencies acquired, where the sales contracts contained covenants not to compete and the contracts specifically allocated the purchase price among the covenants and other property, primarily to the covenants.

Petitioners are the shareholders of Mortgage, which corporation elected in the taxable years in question to be taxed as a subchapter S corporation.

Petitioners argue that each of the four contracts specifically allocate to the covenant the portion of the purchase price for which amortization is sought; that three of the contracts contained provisions for liquidated damages in the event the seller breached the covenant; and that Mortgage was primarily interested in eliminating the sellers from competition, rather than acquiring intangibles or goodwill.

Respondent argues that the assignment of a large portion of the purchase price to the covenant was arbitrary, being motivated solely for tax purposes; that Mortgage was primarily interested in acquiring new business, goodwill, expiration records, and other intangibles; and that the value of the covenant is not severable from the value of the other assets acquired.

We agree with petitioners. It is clear that the contracts specifically allocated a fixed dollar amount to the covenant, and as was said in *Ullman* v. *Commissioner*, 264 F. 2d 305, affirming 29 T.C. 129:

when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration. The tax avoidance desires of the buyer and seller in such a situation are ordinarily antithetical, forcing them, in most cases, to agree upon a treatment which reflects the parties' true intent with reference to the covenants, and the true value of them in money.

While neither the Commissioner nor the courts are bound by the form in which the parties clothe the transaction, *Carl L. Danielson*, 44 T.C. 549, on appeal (C.A. 3, Dec. 21, 1965); *Hamlin's Trust* v. *Com-*

*missioner*, 209 F. 2d 761, affirming 19 T.C. 718, the nub of the question is whether the covenant not to compete was actually dealt with as a separate item in the transaction and, if it was, how much was paid for it. *Gazette Telegraph Co.*, 19 T.C 692, affd. 209 F. 2d 926; *Howard Construction, Inc.*, 43 T.C. 343. We have quite recently considered this issue in *Benjamin Levinson*, 45 T.C. 380, and much of what we said in the opinion in that case with reference to the legal aspects of the issue is applicable here. We see no point in repeating that discussion here; instead we simply refer to our opinion in that case.

Three of the contracts involved, in addition to assigning a specific value to the covenant, also provided for liquidated damages in the event the seller breached the covenant. We believe this is strong evidence supporting the petitioners' contention that both buyer and seller were aware that Mortgage was primarily interested in eliminating the seller from competition. In fact, some of the contracts specifically stated that the purchaser "desires to eliminate competition," and three contracts provided that payment of the agreed-upon value of the covenant shall constitute consideration in full for the elimination of the seller from competition with the purchaser for a period of 5 years.

Furthermore, in most instances the physical assets acquired were minimal, and any value attributed to them appears to be fair and reasonable. Respondent urges that Mortgage was primarily interested in acquiring expiration lists, customer lists, prospect lists, office records, and goodwill, and that these items are not subject to amortization, citing Rev. Rul. 65–180, 1965–2 C.B. 279; *George J. Aitken*, 35 T.C. 227; and *Edward A. Kenney*, 37 T.C. 1161. The difficulty with respondent's argument is that there is little, if any, evidence which indicates any substantial portion of the purchase price could be assigned or allocated to these intangibles or goodwill. In one instance, the Bevington contract, these items were separately valued at $500 and petitioners agree that no amortization for this amount is proper.

The evidence fairly indicates that Mortgage was not interested in continuing the agency acquired in the same location. In fact, most of the sellers continued in their real estate sales business, and simply ceased the insurance business altogether. No effort was made by Mortgage to use the office space, location, or name that might have been developed over the years. The sellers did write their customers thanking them for their business and informing them of the sale, but the evidence rather clearly indicates that most of the attributes present in the acquisition of goodwill were absent in the present case.

It is true that the agreement with McFadgen provided that he would continue as an employee for Mortgage for 3 years at $500 per month, but this portion of the contract was separately stated, and it appears that a covenant not to compete would still be required to protect

Mortgage from competition from McFadgen because McFadgen was not *obligated* to continue as an employee of Mortgage.

Respondent also urges that the purchaser was primarily interested in allocating a large portion of the purchase price to the covenant for tax purposes. Petitioners readily acknowledge that they obtained advice from their tax advisers, but urge that this factor should not be determinative of the issue presented. Perhaps Mortgage agreed to pay more for the elimination of competition than would have been the case if the tax advantages were not present, but it might also be true that Mortgage was also strongly motivated by the desire to eliminate competition. Probably it was motivated by both considerations. But the awareness on the part of the buyer of the tax advantages in a transaction such as this should not, standing alone, determine the outcome. See *Benjamin Levinson, supra; Schulz* v. *Commissioner*, 294 F. 2d 52, affirming 34 T.C. 235. There is no indication that Mortgage engaged in overreaching, or that the sellers had been unwittingly maneuvered into a position with a big tax disadvantage. See *Hamlin's Trust* v. *Commissioner, supra; Carl L. Danielson, supra.*

Where, as here, it is clear that the purchaser and seller agreed in a contract to specific allocations of the purchase price to the covenant, and the contract also contained a liquidated damages provision, we believe the agreement should stand as written unless strong proof is adduced that the allocation was not separately bargained for, or should be ignored for other reasons. See *Benjamin Levinson, supra; Schulz* v. *Commissioner, supra; Carl L. Danielson, supra.* There is no evidence to support such a conclusion here. We decide this issue for petitioners.

*Decisions will be entered under Rule 50.*